# NEW YORK TIMES CO. *v.* UNITED STATES

No. 1873.   Argued June 26, 1971—Decided June 30, 1971*

*Alexander M. Bickel* argued the cause for petitioner in No. 1873. With him on the brief were *William E. Hegarty* and *Lawrence J. McKay.*

*Solicitor General Griswold* argued the cause for the United States in both cases. With him on the brief were *Assistant Attorney General Mardian* and *Daniel M. Friedman.*

*William R. Glendon* argued the cause for respondents in No. 1885. With him on the brief were *Roger A. Clark, Anthony F. Essaye, Leo P. Larkin, Jr.,* and *Stanley Godofsky.*

Briefs of *amici curiae* were filed by *Bob Eckhardt* and *Thomas I. Emerson* for Twenty-Seven Members of Congress; by *Norman Dorsen, Melvin L. Wulf, Burt Neuborne, Bruce J. Ennis, Osmond K. Fraenkel,* and *Marvin M. Karpatkin* for the American Civil Liberties Union; and by *Victor Rabinowitz* for the National Emergency Civil Liberties Committee.

---

*Together with No. 1885, *United States* v. *Washington Post Co. et al.*, on certiorari to the United States Court of Appeals for the District of Columbia Circuit.

PER CURIAM.

We granted certiorari in these cases in which the United States seeks to enjoin the New York Times and the Washington Post from publishing the contents of a classified study entitled "History of U. S. Decision-Making Process on Viet Nam Policy." *Post*, pp. 942, 943.

"Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58, 70 (1963); see also *Near* v. *Minnesota,* 283 U. S. 697 (1931). The Government "thus carries a heavy burden of showing justification for the imposition of such a restraint." *Organization for a Better Austin* v. *Keefe,* 402 U. S. 415, 419 (1971). The District Court for the Southern District of New York in the *New York Times* case and the District Court for the District of Columbia and the Court of Appeals for the District of Columbia Circuit in the *Washington Post* case held that the Government had not met that burden. We agree.

The judgment of the Court of Appeals for the District of Columbia Circuit is therefore affirmed. The order of the Court of Appeals for the Second Circuit is reversed and the case is remanded with directions to enter a judgment affirming the judgment of the District Court for the Southern District of New York. The stays entered June 25, 1971, by the Court are vacated. The judgments shall issue forthwith.

*So ordered.*

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS joins, concurring.

I adhere to the view that the Government's case against the Washington Post should have been dismissed and that the injunction against the New York Times should have been vacated without oral argument when the cases were first presented to this Court. I believe

that every moment's continuance of the injunctions against these newspapers amounts to a flagrant, indefensible, and continuing violation of the First Amendment. Furthermore, after oral argument, I agree completely that we must affirm the judgment of the Court of Appeals for the District of Columbia Circuit and reverse the judgment of the Court of Appeals for the Second Circuit for the reasons stated by my Brothers DOUGLAS and BRENNAN. In my view it is unfortunate that some of my Brethren are apparently willing to hold that the publication of news may sometimes be enjoined. Such a holding would make a shambles of the First Amendment.

Our Government was launched in 1789 with the adoption of the Constitution. The Bill of Rights, including the First Amendment, followed in 1791. Now, for the first time in the 182 years since the founding of the Republic, the federal courts are asked to hold that the First Amendment does not mean what it says, but rather means that the Government can halt the publication of current news of vital importance to the people of this country.

In seeking injunctions against these newspapers and in its presentation to the Court, the Executive Branch seems to have forgotten the essential purpose and history of the First Amendment. When the Constitution was adopted, many people strongly opposed it because the document contained no Bill of Rights to safeguard certain basic freedoms.[1] They especially feared that the

---

[1] In introducing the Bill of Rights in the House of Representatives, Madison said: "[B]ut I believe that the great mass of the people who opposed [the Constitution], disliked it because it did not contain effectual provisions against the encroachments on particular rights . . . ." 1 Annals of Cong. 433. Congressman Goodhue added: "[I]t is the wish of many of our constituents, that something should be added to the Constitution, to secure in a stronger manner their liberties from the inroads of power." *Id.*, at 426.

new powers granted to a central government might be interpreted to permit the government to curtail freedom of religion, press, assembly, and speech. In response to an overwhelming public clamor, James Madison offered a series of amendments to satisfy citizens that these great liberties would remain safe and beyond the power of government to abridge. Madison proposed what later became the First Amendment in three parts, two of which are set out below, and one of which proclaimed: "The people shall not be deprived or abridged of their right to speak, to write, or to publish their sentiments; *and the freedom of the press, as one of the great bulwarks of liberty, shall be inviolable.*" [2] (Emphasis added.) The amendments were offered to *curtail* and *restrict* the general powers granted to the Executive, Legislative, and Judicial Branches two years before in the original Constitution. The Bill of Rights changed the original Constitution into a new charter under which no branch of government could abridge the people's freedoms of press, speech, religion, and assembly. Yet the Solicitor General argues and some members of the Court appear to agree that the general powers of the Government adopted in the original Constitution should be interpreted to limit and restrict the specific and emphatic guarantees of the Bill of Rights adopted later. I can imagine no greater perversion of history. Madison and the other Framers of the First Amendment, able men

---

[2] The other parts were:

"The civil rights of none shall be abridged on account of religious belief or worship, nor shall any national religion be established, nor shall the full and equal rights of conscience be in any manner, or on any pretext, infringed."

"The people shall not be restrained from peaceably assembling and consulting for their common good; nor from applying to the Legislature by petitions, or remonstrances, for redress of their grievances." 1 Annals of Cong. 434.

that they were, wrote in language they earnestly believed could never be misunderstood: "Congress shall make no law . . . abridging the freedom . . . of the press . . . ." Both the history and language of the First Amendment support the view that the press must be left free to publish news, whatever the source, without censorship, injunctions, or prior restraints.

In the First Amendment the Founding Fathers gave the free press the protection it must have to fulfill its essential role in our democracy. The press was to serve the governed, not the governors. The Government's power to censor the press was abolished so that the press would remain forever free to censure the Government. The press was protected so that it could bare the secrets of government and inform the people. Only a free and unrestrained press can effectively expose deception in government. And paramount among the responsibilities of a free press is the duty to prevent any part of the government from deceiving the people and sending them off to distant lands to die of foreign fevers and foreign shot and shell. In my view, far from deserving condemnation for their courageous reporting, the New York Times, the Washington Post, and other newspapers should be commended for serving the purpose that the Founding Fathers saw so clearly. In revealing the workings of government that led to the Vietnam war, the newspapers nobly did precisely that which the Founders hoped and trusted they would do.

The Government's case here is based on premises entirely different from those that guided the Framers of the First Amendment. The Solicitor General has carefully and emphatically stated:

"Now, Mr. Justice [BLACK], your construction of . . . [the First Amendment] is well known, and I certainly respect it. You say that no law means no law, and that should be obvious. I can only

say, Mr. Justice, that to me it is equally obvious that 'no law' does not mean 'no law', and I would seek to persuade the Court that that is true. . . . [T]here are other parts of the Constitution that grant powers and responsibilities to the Executive, and . . . the First Amendment was not intended to make it impossible for the Executive to function or to protect the security of the United States." [3]

And the Government argues in its brief that in spite of the First Amendment, "[t]he authority of the Executive Department to protect the nation against publication of information whose disclosure would endanger the national security stems from two interrelated sources: the constitutional power of the President over the conduct of foreign affairs and his authority as Commander-in-Chief." [4]

In other words, we are asked to hold that despite the First Amendment's emphatic command, the Executive Branch, the Congress, and the Judiciary can make laws enjoining publication of current news and abridging freedom of the press in the name of "national security." The Government does not even attempt to rely on any act of Congress. Instead it makes the bold and dangerously far-reaching contention that the courts should take it upon themselves to "make" a law abridging freedom of the press in the name of equity, presidential power and national security, even when the representatives of the people in Congress have adhered to the command of the First Amendment and refused to make such a law. [5] See concurring opinion of MR. JUSTICE DOUGLAS,

---

[3] Tr. of Oral Arg. 76.

[4] Brief for the United States 13–14.

[5] Compare the views of the Solicitor General with those of James Madison, the author of the First Amendment. When speaking of the Bill of Rights in the House of Representatives, Madison said: "If they [the first ten amendments] are incorporated into the Con-

*post*, at 721–722. To find that the President has "inherent power" to halt the publication of news by resort to the courts would wipe out the First Amendment and destroy the fundamental liberty and security of the very people the Government hopes to make "secure." No one can read the history of the adoption of the First Amendment without being convinced beyond any doubt that it was injunctions like those sought here that Madison and his collaborators intended to outlaw in this Nation for all time.

The word "security" is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment. The guarding of military and diplomatic secrets at the expense of informed representative government provides no real security for our Republic. The Framers of the First Amendment, fully aware of both the need to defend a new nation and the abuses of the English and Colonial governments, sought to give this new society strength and security by providing that freedom of speech, press, religion, and assembly should not be abridged. This thought was eloquently expressed in 1937 by Mr. Chief Justice Hughes—great man and great Chief Justice that he was—when the Court held a man could not be punished for attending a meeting run by Communists.

"The greater the importance of safeguarding the community from incitements to the overthrow of our institutions by force and violence, the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free

---

stitution, independent tribunals of justice will consider themselves in a peculiar manner the guardians of those rights; they will be an impenetrable bulwark against every assumption of power in the Legislative or Executive; they will be naturally led to resist every encroachment upon rights expressly stipulated for in the Constitution by the declaration of rights." 1 Annals of Cong. 439.

assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government." [6]

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK joins, concurring.

While I join the opinion of the Court I believe it necessary to express my views more fully.

It should be noted at the outset that the First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press." That leaves, in my view, no room for governmental restraint on the press.[1]

There is, moreover, no statute barring the publication by the press of the material which the Times and the Post seek to use. Title 18 U. S. C. § 793 (e) provides that "[w]hoever having unauthorized possession of, access to, or control over any document, writing . . . or information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation, willfully communicates . . . the same to any person not entitled to receive it . . . . [s]hall be fined

---

[6] *De Jonge* v. *Oregon*, 299 U. S. 353, 365.

[1] See *Beauharnais* v. *Illinois*, 343 U. S. 250, 267 (dissenting opinion of MR. JUSTICE BLACK), 284 (my dissenting opinion); *Roth* v. *United States*, 354 U. S. 476, 508 (my dissenting opinion which MR. JUSTICE BLACK joined); *Yates* v. *United States*, 354 U. S. 298, 339 (separate opinion of MR. JUSTICE BLACK which I joined); *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 293 (concurring opinion of MR. JUSTICE BLACK which I joined); *Garrison* v. *Louisiana*, 379 U. S. 64, 80 (my concurring opinion which MR. JUSTICE BLACK joined).

not more than $10,000 or imprisoned not more than ten years, or both."

The Government suggests that the word "communicates" is broad enough to encompass publication.

There are eight sections in the chapter on espionage and censorship, §§ 792–799. In three of those eight "publish" is specifically mentioned: § 794 (b) applies to "Whoever, in time of war, with intent that the same shall be communicated to the enemy, collects, records, *publishes,* or communicates . . . [the disposition of armed forces]."

Section 797 applies to whoever "reproduces, *publishes,* sells, or gives away" photographs of defense installations.

Section 798 relating to cryptography applies to whoever: "communicates, furnishes, transmits, or otherwise makes available . . . *or publishes*" the described material.[2] (Emphasis added.)

Thus it is apparent that Congress was capable of and did distinguish between publishing and communication in the various sections of the Espionage Act.

The other evidence that § 793 does not apply to the press is a rejected version of § 793. That version read: "During any national emergency resulting from a war to which the United States is a party, or from threat of such a war, the President may, by proclamation, declare the existence of such emergency and, by proclamation, prohibit the publishing or communicating of, or the attempting to publish or communicate any information relating to the national defense which, in his judgment, is of such character that it is or might be useful to the

---

[2] These documents contain data concerning the communications system of the United States, the publication of which is made a crime. But the criminal sanction is not urged by the United States as the basis of equity power.

enemy." 55 Cong. Rec. 1763. During the debates in the Senate the First Amendment was specifically cited and that provision was defeated. 55 Cong. Rec. 2167.

Judge Gurfein's holding in the *Times* case that this Act does not apply to this case was therefore pre-eminently sound. Moreover, the Act of September 23, 1950, in amending 18 U. S. C. § 793 states in § 1 (b) that:

> "Nothing in this Act shall be construed to author-ize, require, or establish military or civilian censor-ship or in any way to limit or infringe upon freedom of the press or of speech as guaranteed by the Con-stitution of the United States and no regulation shall be promulgated hereunder having that effect." 64 Stat. 987.

Thus Congress has been faithful to the command of the First Amendment in this area.

So any power that the Government possesses must come from its "inherent power."

The power to wage war is "the power to wage war suc-cessfully." See *Hirabayashi* v. *United States*, 320 U. S. 81, 93. But the war power stems from a declaration of war. The Constitution by Art. I, § 8, gives Congress, not the President, power "[t]o declare War." No-where are presidential wars authorized. We need not decide therefore what leveling effect the war power of Congress might have.

These disclosures [3] may have a serious impact. But that is no basis for sanctioning a previous restraint on

---

[3] There are numerous sets of this material in existence and they apparently are not under any controlled custody. Moreover, the President has sent a set to the Congress. We start then with a case where there already is rather wide distribution of the material that is destined for publicity, not secrecy. I have gone over the material listed in the *in camera* brief of the United States. It is all history, not future events. None of it is more recent than 1968.

the press. As stated by Chief Justice Hughes in *Near* v. *Minnesota*, 283 U. S. 697, 719–720:

> "While reckless assaults upon public men, and efforts to bring obloquy upon those who are endeavoring faithfully to discharge official duties, exert a baleful influence and deserve the severest condemnation in public opinion, it cannot be said that this abuse is greater, and it is believed to be less, than that which characterized the period in which our institutions took shape. Meanwhile, the administration of government has become more complex, the opportunities for malfeasance and corruption have multiplied, crime has grown to most serious proportions, and the danger of its protection by unfaithful officials and of the impairment of the fundamental security of life and property by criminal alliances and official neglect, emphasizes the primary need of a vigilant and courageous press, especially in great cities. The fact that the liberty of the press may be abused by miscreant purveyors of scandal does not make any the less necessary the immunity of the press from previous restraint in dealing with official misconduct."

As we stated only the other day in *Organization for a Better Austin* v. *Keefe*, 402 U. S. 415, 419, "[a]ny prior restraint on expression comes to this Court with a 'heavy presumption' against its constitutional validity."

The Government says that it has inherent powers to go into court and obtain an injunction to protect the national interest, which in this case is alleged to be national security.

*Near* v. *Minnesota*, 283 U. S. 697, repudiated that expansive doctrine in no uncertain terms.

The dominant purpose of the First Amendment was to prohibit the widespread practice of governmental sup-

pression of embarrassing information. It is common knowledge that the First Amendment was adopted against the widespread use of the common law of seditious libel to punish the dissemination of material that is embarrassing to the powers-that-be. See T. Emerson, The System of Freedom of Expression, c. V (1970); Z. Chafee, Free Speech in the United States, c. XIII (1941). The present cases will, I think, go down in history as the most dramatic illustration of that principle. A debate of large proportions goes on in the Nation over our posture in Vietnam. That debate antedated the disclosure of the contents of the present documents. The latter are highly relevant to the debate in progress.

Secrecy in government is fundamentally anti-democratic, perpetuating bureaucratic errors. Open debate and discussion of public issues are vital to our national health. On public questions there should be "uninhibited, robust, and wide-open" debate. *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 269–270.

I would affirm the judgment of the Court of Appeals in the *Post* case, vacate the stay of the Court of Appeals in the *Times* case and direct that it affirm the District Court.

The stays in these cases that have been in effect for more than a week constitute a flouting of the principles of the First Amendment as interpreted in *Near* v. *Minnesota.*

MR. JUSTICE BRENNAN, concurring.

I

I write separately in these cases only to emphasize what should be apparent: that our judgments in the present cases may not be taken to indicate the propriety, in the future, of issuing temporary stays and restraining

orders to block the publication of material sought to be suppressed by the Government. So far as I can determine, never before has the United States sought to enjoin a newspaper from publishing information in its possession. The relative novelty of the questions presented, the necessary haste with which decisions were reached, the magnitude of the interests asserted, and the fact that all the parties have concentrated their arguments upon the question whether permanent restraints were proper may have justified at least some of the restraints heretofore imposed in these cases. Certainly it is difficult to fault the several courts below for seeking to assure that the issues here involved were preserved for ultimate review by this Court. But even if it be assumed that some of the interim restraints were proper in the two cases before us, that assumption has no bearing upon the propriety of similar judicial action in the future. To begin with, there has now been ample time for reflection and judgment; whatever values there may be in the preservation of novel questions for appellate review may not support any restraints in the future. More important, the First Amendment stands as an absolute bar to the imposition of judicial restraints in circumstances of the kind presented by these cases.

## II

The error that has pervaded these cases from the outset was the granting of any injunctive relief whatsoever, interim or otherwise. The entire thrust of the Government's claim throughout these cases has been that publication of the material sought to be enjoined "could," or "might," or "may" prejudice the national interest in various ways. But the First Amendment tolerates absolutely no prior judicial restraints of the press predicated upon surmise or conjecture that untoward consequences

may result.* Our cases, it is true, have indicated that there is a single, extremely narrow class of cases in which the First Amendment's ban on prior judicial restraint may be overridden. Our cases have thus far indicated that such cases may arise only when the Nation "is at war," *Schenck* v. *United States,* 249 U. S. 47, 52 (1919), during which times "[n]o one would question but that a government might prevent actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and location of troops." *Near* v. *Minnesota,* 283 U. S. 697, 716 (1931). Even if the present world situation were assumed to be tantamount to a time of war, or if the power of presently available armaments would justify even in peacetime the suppression of information that would set in motion a nuclear holocaust, in neither of these actions has the Government presented or even alleged that publication of items from or based upon the material at issue would cause the happening of an event of that nature. "[T]he chief purpose of [the First Amendment's] guaranty [is] to prevent previous restraints upon publication." *Near* v. *Minnesota, supra,* at 713. Thus, only governmental allegation and proof that publication must inevitably, di-

---

*\*Freedman* v. *Maryland,* 380 U. S. 51 (1965), and similar cases regarding temporary restraints of allegedly obscene materials are not in point. For those cases rest upon the proposition that "obscenity is not protected by the freedoms of speech and press." *Roth* v. *United States,* 354 U. S. 476, 481 (1957). Here there is no question but that the material sought to be suppressed is within the protection of the First Amendment; the only question is whether, notwithstanding that fact, its publication may be enjoined for a time because of the presence of an overwhelming national interest. Similarly, copyright cases have no pertinence here: the Government is not asserting an interest in the particular form of words chosen in the documents, but is seeking to suppress the ideas expressed therein. And the copyright laws, of course, protect only the form of expression and not the ideas expressed.

rectly, and immediately cause the occurrence of an event kindred to imperiling the safety of a transport already at sea can support even the issuance of an interim restraining order. In no event may mere conclusions be sufficient: for if the Executive Branch seeks judicial aid in preventing publication, it must inevitably submit the basis upon which that aid is sought to scrutiny by the judiciary. And therefore, every restraint issued in this case, whatever its form, has violated the First Amendment—and not less so because that restraint was justified as necessary to afford the courts an opportunity to examine the claim more thoroughly. Unless and until the Government has clearly made out its case, the First Amendment commands that no injunction may issue.

MR. JUSTICE STEWART, with whom MR. JUSTICE WHITE joins, concurring.

In the governmental structure created by our Constitution, the Executive is endowed with enormous power in the two related areas of national defense and international relations. This power, largely unchecked by the Legislative [1] and Judicial [2] branches, has been pressed to the very hilt since the advent of the nuclear missile age. For better or for worse, the simple fact is that a

---

[1] The President's power to make treaties and to appoint ambassadors is, of course, limited by the requirement of Art. II, § 2, of the Constitution that he obtain the advice and consent of the Senate. Article I, § 8, empowers Congress to "raise and support Armies," and "provide and maintain a Navy." And, of course, Congress alone can declare war. This power was last exercised almost 30 years ago at the inception of World War II. Since the end of that war in 1945, the Armed Forces of the United States have suffered approximately half a million casualties in various parts of the world.

[2] See *Chicago & Southern Air Lines* v. *Waterman S. S. Corp.,* 333 U. S. 103; *Hirabayashi* v. *United States,* 320 U. S. 81; *United States* v. *Curtiss-Wright Corp.,* 299 U. S. 304; cf. *Mora* v. *McNamara,* 128 U. S. App. D. C. 297, 387 F. 2d 862, cert. denied, 389 U. S. 934.

President of the United States possesses vastly greater constitutional independence in these two vital areas of power than does, say, a prime minister of a country with a parliamentary form of government.

In the absence of the governmental checks and balances present in other areas of our national life, the only effective restraint upon executive policy and power in the areas of national defense and international affairs may lie in an enlightened citizenry—in an informed and critical public opinion which alone can here protect the values of democratic government. For this reason, it is perhaps here that a press that is alert, aware, and free most vitally serves the basic purpose of the First Amendment. For without an informed and free press there cannot be an enlightened people.

Yet it is elementary that the successful conduct of international diplomacy and the maintenance of an effective national defense require both confidentiality and secrecy. Other nations can hardly deal with this Nation in an atmosphere of mutual trust unless they can be assured that their confidences will be kept. And within our own executive departments, the development of considered and intelligent international policies would be impossible if those charged with their formulation could not communicate with each other freely, frankly, and in confidence. In the area of basic national defense the frequent need for absolute secrecy is, of course, self-evident.

I think there can be but one answer to this dilemma, if dilemma it be. The responsibility must be where the power is.[3] If the Constitution gives the Executive

---

[3] "It is quite apparent that if, in the maintenance of our international relations, embarrassment—perhaps serious embarrassment—is to be avoided and success for our aims achieved, congressional legislation which is to be made effective through negotiation and inquiry within the international field must often accord to the President a degree of discretion and freedom from statutory restriction which

a large degree of unshared power in the conduct of foreign affairs and the maintenance of our national defense, then under the Constitution the Executive must have the largely unshared duty to determine and preserve the degree of internal security necessary to exercise that power successfully. It is an awesome responsibility, requiring judgment and wisdom of a high order. I should suppose that moral, political, and practical considerations would dictate that a very first principle of that wisdom would be an insistence upon avoiding secrecy for its own sake. For when everything is classified, then nothing is classified, and the system becomes one to be disregarded by the cynical or the careless, and to be manipulated by those intent on self-protection or self-promotion. I should suppose, in short, that the hallmark of a truly effective internal security system would be the maximum possible disclosure, recognizing that secrecy can best be preserved only when credibility is truly maintained. But be that as it may, it is clear to me that it is the constitutional duty of the Executive—as a matter of sovereign prerogative and not as a matter of law as the courts know law—through the promulgation and enforcement of executive regulations, to protect

---

would not be admissible were domestic affairs alone involved. Moreover, he, not Congress, has the better opportunity of knowing the conditions which prevail in foreign countries, and especially is this true in time of war. He has his confidential sources of information. He has his agents in the form of diplomatic, consular and other officials. Secrecy in respect of information gathered by them may be highly necessary, and the premature disclosure of it productive of harmful results. Indeed, so clearly is this true that the first President refused to accede to a request to lay before the House of Representatives the instructions, correspondence and documents relating to the negotiation of the Jay Treaty—a refusal the wisdom of which was recognized by the House itself and has never since been doubted. . . ." *United States* v. *Curtiss-Wright Corp.,* 299 U. S. 304, 320.

the confidentiality necessary to carry out its responsibilities in the fields of international relations and national defense.

This is not to say that Congress and the courts have no role to play. Undoubtedly Congress has the power to enact specific and appropriate criminal laws to protect government property and preserve government secrets. Congress has passed such laws, and several of them are of very colorable relevance to the apparent circumstances of these cases. And if a criminal prosecution is instituted, it will be the responsibility of the courts to decide the applicability of the criminal law under which the charge is brought. Moreover, if Congress should pass a specific law authorizing civil proceedings in this field, the courts would likewise have the duty to decide the constitutionality of such a law as well as its applicability to the facts proved.

But in the cases before us we are asked neither to construe specific regulations nor to apply specific laws. We are asked, instead, to perform a function that the Constitution gave to the Executive, not the Judiciary. We are asked, quite simply, to prevent the publication by two newspapers of material that the Executive Branch insists should not, in the national interest, be published. I am convinced that the Executive is correct with respect to some of the documents involved. But I cannot say that disclosure of any of them will surely result in direct, immediate, and irreparable damage to our Nation or its people. That being so, there can under the First Amendment be but one judicial resolution of the issues before us. I join the judgments of the Court.

Mr. Justice White, with whom Mr. Justice Stewart joins, concurring.

I concur in today's judgments, but only because of the concededly extraordinary protection against prior re-

straints enjoyed by the press under our constitutional system. I do not say that in no circumstances would the First Amendment permit an injunction against publishing information about government plans or operations.[1] Nor, after examining the materials the Government characterizes as the most sensitive and destructive, can I deny that revelation of these documents will do substantial damage to public interests. Indeed, I am confident that their disclosure will have that result. But I nevertheless agree that the United States has not satisfied the very heavy burden that it must meet to warrant an injunction against publication in these cases, at least in the absence of express and appropriately limited congressional authorization for prior restraints in circumstances such as these.

[1] The Congress has authorized a strain of prior restraints against private parties in certain instances. The National Labor Relations Board routinely issues cease-and-desist orders against employers who it finds have threatened or coerced employees in the exercise of protected rights. See 29 U. S. C. § 160 (c). Similarly, the Federal Trade Commission is empowered to impose cease-and-desist orders against unfair methods of competition. 15 U. S. C. § 45 (b). Such orders can, and quite often do, restrict what may be spoken, or written under certain circumstances. See, e. g., NLRB v. Gissel Packing Co., 395 U. S. 575, 616–620 (1969). Article I, § 8, of the Constitution authorizes Congress to secure the "exclusive right" of authors to their writings, and no one denies that a newspaper can properly be enjoined from publishing the copyrighted works of another. See Westermann Co. v. Dispatch Co., 249 U. S. 100 (1919). Newspapers do themselves rely from time to time on the copyright as a means of protecting their accounts of important events. However, those enjoined under the statutes relating to the National Labor Relations Board and the Federal Trade Commission are private parties, not the press; and when the press is enjoined under the copyright laws the complainant is a private copyright holder enforcing a private right. These situations are quite distinct from the Government's request for an injunction against publishing information about the affairs of government, a request admittedly not based on any statute.

732

The Government's position is simply stated: The responsibility of the Executive for the conduct of the foreign affairs and for the security of the Nation is so basic that the President is entitled to an injunction against publication of a newspaper story whenever he can convince a court that the information to be revealed threatens "grave and irreparable" injury to the public interest;[2] and the injunction should issue whether or not the material to be published is classified, whether or not publication would be lawful under relevant criminal statutes enacted by Congress, and regardless of the circumstances by which the newspaper came into possession of the information.

At least in the absence of legislation by Congress, based on its own investigations and findings, I am quite unable to agree that the inherent powers of the Executive and the courts reach so far as to authorize remedies having such sweeping potential for inhibiting publications by the press. Much of the difficulty inheres in the "grave and irreparable danger" standard suggested by the United States. If the United States were to have judgment under such a standard in these cases, our decision would be of little guidance to other courts in other cases, for the material at issue here would not be available from the Court's opinion or from public records, nor would it be published by the press. Indeed, even today where we hold that the United States has not met its burden, the material remains sealed in court records and it is

[2] The "grave and irreparable danger" standard is that asserted by the Government in this Court. In remanding to Judge Gurfein for further hearings in the *Times* litigation, five members of the Court of Appeals for the Second Circuit directed him to determine whether disclosure of certain items specified with particularity by the Government would "pose such grave and immediate danger to the security of the United States as to warrant their publication being enjoined."

properly not discussed in today's opinions. Moreover, because the material poses substantial dangers to national interests and because of the hazards of criminal sanctions, a responsible press may choose never to publish the more sensitive materials. To sustain the Government in these cases would start the courts down a long and hazardous road that I am not willing to travel, at least without congressional guidance and direction.

It is not easy to reject the proposition urged by the United States and to deny relief on its good-faith claims in these cases that publication will work serious damage to the country. But that discomfiture is considerably dispelled by the infrequency of prior-restraint cases. Normally, publication will occur and the damage be done before the Government has either opportunity or grounds for suppression. So here, publication has already begun and a substantial part of the threatened damage has already occurred. The fact of a massive breakdown in security is known, access to the documents by many unauthorized people is undeniable, and the efficacy of equitable relief against these or other newspapers to avert anticipated damage is doubtful at best.

What is more, terminating the ban on publication of the relatively few sensitive documents the Government now seeks to suppress does not mean that the law either requires or invites newspapers or others to publish them or that they will be immune from criminal action if they do. Prior restraints require an unusually heavy justification under the First Amendment; but failure by the Government to justify prior restraints does not measure its constitutional entitlement to a conviction for criminal publication. That the Government mistakenly chose to proceed by injunction does not mean that it could not successfully proceed in another way.

When the Espionage Act was under consideration in

1917, Congress eliminated from the bill a provision that would have given the President broad powers in time of war to proscribe, under threat of criminal penalty, the publication of various categories of information related to the national defense.[3] Congress at that time was unwilling to clothe the President with such far-reaching powers to monitor the press, and those opposed to this part of the legislation assumed that a necessary concomitant of such power was the power to "filter out the news to the people through some man." 55 Cong. Rec. 2008 (remarks of Sen. Ashurst). However, these same members of Congress appeared to have little doubt that newspapers would be subject to criminal prosecution if they insisted on publishing information of the type Congress had itself determined should not be revealed. Senator Ashurst, for example, was quite sure that the editor of such a newspaper "should be punished if he did publish information as to the movements of the fleet, the troops, the aircraft, the location of powder factories, the location of defense works, and all that sort of thing." *Id.*, at 2009.[4]

---

[3] "Whoever, in time of war, in violation of reasonable regulations to be prescribed by the President, which he is hereby authorized to make and promulgate, shall publish any information with respect to the movement, numbers, description, condition, or disposition of any of the armed forces, ships, aircraft, or war materials of the United States, or with respect to the plans or conduct of any naval or military operations, or with respect to any works or measures undertaken for or connected with, or intended for the fortification or defense of any place, or any other information relating to the public defense calculated to be useful to the enemy, shall be punished by a fine . . . or by imprisonment . . . ." 55 Cong. Rec. 2100.

[4] Senator Ashurst also urged that " 'freedom of the press' means freedom from the restraints of a censor, means the absolute liberty and right to publish whatever you wish; but you take your chances of punishment in the courts of your country for the violation of the laws of libel, slander, and treason." 55 Cong. Rec. 2005.

The Criminal Code contains numerous provisions potentially relevant to these cases. Section 797 [5] makes it a crime to publish certain photographs or drawings of military installations. Section 798,[6] also in precise language, proscribes knowing and willful publication of any classified information concerning the cryptographic sys-

---

[5] Title 18 U. S. C. § 797 provides:

"On and after thirty days from the date upon which the President defines any vital military or naval installation or equipment as being within the category contemplated under section 795 of this title, whoever reproduces, publishes, sells, or gives away any photograph, sketch, picture, drawing, map, or graphical representation of the vital military or naval installations or equipment so defined, without first obtaining permission of the commanding officer of the military or naval post, camp, or station concerned, or higher authority, unless such photograph, sketch, picture, drawing, map, or graphical representation has clearly indicated thereon that it has been censored by the proper military or naval authority, shall be fined not more than $1,000 or imprisoned not more than one year, or both."

[6] In relevant part 18 U. S. C. § 798 provides:

"(a) Whoever knowingly and willfully communicates, furnishes, transmits, or otherwise makes available to an unauthorized person, or publishes, or uses in any manner prejudicial to the safety or interest of the United States or for the benefit of any foreign government to the detriment of the United States any classified information—

"(1) concerning the nature, preparation, or use of any code, cipher, or cryptographic system of the United States or any foreign government; or

"(2) concerning the design, construction, use, maintenance, or repair of any device, apparatus, or appliance used or prepared or planned for use by the United States or any foreign government for cryptographic or communication intelligence purposes; or

"(3) concerning the communication intelligence activities of the United States or any foreign government; or

"(4) obtained by the process of communication intelligence from the communications of any foreign government, knowing the same to have been obtained by such processes—

"Shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

tems or communication intelligence activities of the United States as well as any information obtained from communication intelligence operations.[7] If any of the material here at issue is of this nature, the newspapers are presumably now on full notice of the position of the United States and must face the consequences if they

[7] The purport of 18 U. S. C. § 798 is clear. Both the House and Senate Reports on the bill, in identical terms, speak of furthering the security of the United States by preventing disclosure of information concerning the cryptographic systems and the communication intelligence systems of the United States, and explaining that "[t]his bill makes it a crime to reveal the methods, techniques, and matériel used in the transmission by this Nation of enciphered or coded messages. . . . Further, it makes it a crime to reveal methods used by this Nation in breaking the secret codes of a foreign nation. It also prohibits under certain penalties the divulging of any information which may have come into this Government's hands as a result of such a code-breaking." H. R. Rep. No. 1895, 81st Cong., 2d Sess., 1 (1950). The narrow reach of the statute was explained as covering "only a small category of classified matter, a category which is both vital and vulnerable to an almost unique degree." Id., at 2. Existing legislation was deemed inadequate.

"At present two other acts protect this information, but only in a limited way. These are the Espionage Act of 1917. (40 Stat. 217) and the act of June 10, 1933 (48 Stat. 122). Under the first, unauthorized revelation of information of this kind can be penalized only if it can be proved that the person making the revelation did so with an intent to injure the United States. Under the second, only diplomatic codes and messages transmitted in diplomatic codes are protected. The present bill is designed to protect against knowing and willful publication or any other revelation of all important information affecting the United States communication intelligence operations and all direct information about all United States codes and ciphers." Ibid.

Section 798 obviously was intended to cover publications by non-employees of the Government and to ease the Government's burden in obtaining convictions. See H. R. Rep. No. 1895, supra, at 2–5. The identical Senate Report, not cited in parallel in the text of this footnote, is S. Rep. No. 111, 81st Cong., 1st Sess. (1949).

publish. I would have no difficulty in sustaining convictions under these sections on facts that would not justify the intervention of equity and the imposition of a prior restraint.

The same would be true under those sections of the Criminal Code casting a wider net to protect the national defense. Section 793 (e) [8] makes it a criminal act for any unauthorized possessor of a document "relating to the national defense" either (1) willfully to communicate or cause to be communicated that document to any person not entitled to receive it or (2) willfully to retain the document and fail to deliver it to an officer of the United States entitled to receive it. The subsection was added in 1950 because pre-existing law provided no

---

[8] Section 793 (e) of 18 U. S. C. provides that:

"(e) Whoever having unauthorized possession of, access to, or control over any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, or note relating to the national defense, or information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation, willfully communicates, delivers, transmits or causes to be communicated, delivered, or transmitted, or attempts to communicate, deliver, transmit or cause to be communicated, delivered, or transmitted the same to any person not entitled to receive it, or willfully retains the same and fails to deliver it to the officer or employee of the United States entitled to receive it;"

is guilty of an offense punishable by 10 years in prison, a $10,000 fine, or both. It should also be noted that 18 U. S. C. § 793 (g), added in 1950 (see 64 Stat. 1004; S. Rep. No. 2369, pt. 1, 81st Cong., 2d Sess., 9 (1950)), provides that "[i]f two or more persons conspire to violate any of the foregoing provisions of this section, and one or more of such persons do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be subject to the punishment provided for the offense which is the object of such conspiracy."

738

penalty for the unauthorized possessor unless demand for the documents was made.[9] "The dangers surrounding the unauthorized possession of such items are self-

---

[9] The amendment of § 793 that added subsection (e) was part of the Subversive Activities Control Act of 1950, which was in turn Title I of the Internal Security Act of 1950. See 64 Stat. 987. The report of the Senate Judiciary Committee best explains the purposes of the amendment:

"Section 18 of the bill amends section 793 of title 18 of the United States Code (espionage statute). The several paragraphs of section 793 of title 18 are designated as subsections (a) through (g) for purposes of convenient reference. The significant changes which would be made in section 793 of title 18 are as follows:

"(1) Amends the fourth paragraph of section 793, title 18 (subsec. (d)), to cover the unlawful dissemination of 'information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation.' *The phrase 'which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation' would modify only 'information relating to the national defense' and not the other items enumerated in the subsection.* The fourth paragraph of section 793 is also amended to provide that only those with lawful possession of the items relating to national defense enumerated therein may retain them subject to demand therefor. Those who have unauthorized possession of such items are treated in a separate subsection.

"(2) Amends section 793, title 18 (subsec. (e)), to provide that unauthorized possessors of items enumerated in paragraph 4 of section 793 must surrender possession thereof to the proper authorities without demand. Existing law provides no penalty for the unauthorized possession of such items unless a demand for them is made by the person entitled to receive them. The dangers surrounding the unauthorized possession of such items are self-evident, and it is deemed advisable to require their surrender in such a case, regardless of demand, especially since their unauthorized possession may be unknown to the authorities who would otherwise make the demand. The only difference between subsection (d) and subsection (e) of section 793 is that a demand by the person entitled to receive the items would be a necessary element of an offense under subsection (d) where the possession is lawful, whereas such

evident, and it is deemed advisable to require their surrender in such a case, regardless of demand, especially since their unauthorized possession may be unknown to the authorities who would otherwise make the demand." S. Rep. No. 2369, pt. 1, 81st Cong., 2d Sess., 9 (1950). Of course, in the cases before us, the unpublished documents have been demanded by the United States and their import has been made known at least to counsel for the newspapers involved. In *Gorin* v. *United States,* 312 U. S. 19, 28 (1941), the words "national defense" as used in a predecessor of § 793 were held by a unanimous Court to have "a well understood connotation"—a "generic concept of broad connotations, referring to the military and naval establishments and the related activities of national preparedness"—and to be "sufficiently definite to apprise the public of prohibited activi-

a demand would not be a necessary element of an offense under subsection (e) where the possession is unauthorized." S. Rep. No. 2369, pt. 1, 81st Cong., 2d Sess., 8–9 (1950) (emphasis added).

It seems clear from the foregoing, contrary to the intimations of the District Court for the Southern District of New York in this case, that in prosecuting for communicating or withholding a "document" as contrasted with similar action with respect to "information" the Government need not prove an intent to injure the United States or to benefit a foreign nation but only willful and knowing conduct. The District Court relied on *Gorin* v. *United States*, 312 U. S. 19 (1941). But that case arose under other parts of the predecessor to § 793, see 312 U. S., at 21–22—parts that imposed different intent standards not repeated in § 793 (d) or § 793 (e). Cf. 18 U. S. C. §§ 793 (a), (b), and (c). Also, from the face of subsection (e) and from the context of the Act of which it was a part, it seems undeniable that a newspaper, as well as others unconnected with the Government, are vulnerable to prosecution under § 793 (e) if they communicate or withhold the materials covered by that section. The District Court ruled that "communication" did not reach publication by a newspaper of documents relating to the national defense. I intimate no views on the correctness of that conclusion. But neither communication nor publication is necessary to violate the subsection.

ties" and to be consonant with due process. 312 U. S., at 28. Also, as construed by the Court in *Gorin,* information "connected with the national defense" is obviously not limited to that threatening "grave and irreparable" injury to the United States.[10]

It is thus clear that Congress has addressed itself to the problems of protecting the security of the country and the national defense from unauthorized disclosure of potentially damaging information. Cf. *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579, 585–586 (1952); see also *id.,* at 593–628 (Frankfurter, J., concurring). It has not, however, authorized the injunctive remedy against threatened publication. It has apparently been satisfied to rely on criminal sanctions and their deterrent effect on the responsible as well as the irresponsible press. I am not, of course, saying that either of these newspapers has yet committed a crime or that either would commit a crime if it published all the material now in its possession. That matter must await resolution in the context of a criminal proceeding if one is instituted by the United States. In that event, the issue of guilt or innocence would be determined by procedures and standards quite different from those that have purported to govern these injunctive proceedings.

MR. JUSTICE MARSHALL, concurring.

The Government contends that the only issue in these cases is whether in a suit by the United States, "the First Amendment bars a court from prohibiting a news-

---

[10] Also relevant is 18 U. S. C. § 794. Subsection (b) thereof forbids in time of war the collection or publication, with intent that it shall be communicated to the enemy, of any information with respect to the movements of military forces, "or with respect to the plans or conduct . . . of any naval or military operations . . . or any other information relating to the public defense, which might be useful to the enemy . . . ."

paper from publishing material whose disclosure would pose a 'grave and immediate danger to the security of the United States.' " Brief for the United States 7. With all due respect, I believe the ultimate issue in these cases is even more basic than the one posed by the Solicitor General. The issue is whether this Court or the Congress has the power to make law.

In these cases there is no problem concerning the President's power to classify information as "secret" or "top secret." Congress has specifically recognized Presidential authority, which has been formally exercised in Exec. Order 10501 (1953), to classify documents and information. See, *e. g.,* 18 U. S. C. § 798; 50 U. S. C. § 783.[1] Nor is there any issue here regarding the President's power as Chief Executive and Commander in Chief to protect national security by disciplining employees who disclose information and by taking precautions to prevent leaks.

The problem here is whether in these particular cases the Executive Branch has authority to invoke the equity jurisdiction of the courts to protect what it believes to be the national interest. See *In re Debs,* 158 U. S. 564, 584 (1895). The Government argues that in addition to the inherent power of any government to protect itself, the President's power to conduct foreign affairs and his position as Commander in Chief give him authority to impose censorship on the press to protect his ability to deal effectively with foreign nations and to conduct the military affairs of the country. Of course, it is beyond cavil that the President has broad powers by virtue of his primary responsibility for the conduct of our foreign affairs and his position as Commander in Chief. *Chicago & Southern Air Lines* v. *Waterman S. S. Corp.,* 333 U. S. 103 (1948); *Hirabayashi* v. *United States,* 320 U. S. 81, 93 (1943); *United States* v. *Curtiss-*

---

[1] See n. 3, *infra.*

*Wright Corp.*, 299 U. S. 304 (1936).[2]   And in some situations it may be that under whatever inherent powers the Government may have, as well as the implicit authority derived from the President's mandate to conduct foreign affairs and to act as Commander in Chief, there is a basis for the invocation of the equity jurisdiction of this Court as an aid to prevent the publication of material damaging to "national security," however that term may be defined.

It would, however, be utterly inconsistent with the concept of separation of powers for this Court to use its power of contempt to prevent behavior that Congress has specifically declined to prohibit.   There would be a similar damage to the basic concept of these co-equal branches of Government if when the Executive Branch has adequate authority granted by Congress to protect "national security" it can choose instead to invoke the contempt power of a court to enjoin the threatened conduct.   The Constitution provides that Congress shall make laws, the President execute laws, and courts interpret laws. *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579 (1952).   It did not provide for government by injunction in which the courts and the Executive Branch can "make law" without regard to the action of Congress. It may be more convenient for the Executive Branch if it need only convince a judge to prohibit conduct rather than ask the Congress to pass a law, and it may be more convenient to enforce a contempt order than to seek a criminal conviction in a jury trial.   Moreover, it may be considered politically wise to get a court to share the responsibility for arresting those who the Executive Branch has probable cause to believe are violating the law.   But convenience and political considerations of the

---

[2] But see *Kent* v. *Dulles,* 357 U. S. 116 (1958); *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579 (1952)

moment do not justify a basic departure from the principles of our system of government.

In these cases we are not faced with a situation where Congress has failed to provide the Executive with broad power to protect the Nation from disclosure of damaging state secrets. Congress has on several occasions given extensive consideration to the problem of protecting the military and strategic secrets of the United States. This consideration has resulted in the enactment of statutes making it a crime to receive, disclose, communicate, withhold, and publish certain documents, photographs, instruments, appliances, and information. The bulk of these statutes is found in chapter 37 of U. S. C., Title 18, entitled Espionage and Censorship.[3] In that chapter,

---

[3] There are several other statutory provisions prohibiting and punishing the dissemination of information, the disclosure of which Congress thought sufficiently imperiled national security to warrant that result. These include 42 U. S. C. §§ 2161 through 2166 relating to the authority of the Atomic Energy Commission to classify and declassify "Restricted Data" ["Restricted Data" is a term of art employed uniquely by the Atomic Energy Act]. Specifically, 42 U. S. C. § 2162 authorizes the Atomic Energy Commission to classify certain information. Title 42 U. S. C. § 2274, subsection (a), provides penalties for a person who "communicates, transmits, or discloses [restricted data] . . . with intent to injure the United States or with intent to secure an advantage to any foreign nation . . . ." Subsection (b) of § 2274 provides lesser penalties for one who "communicates, transmits, or discloses" such information "with reason to believe such data will be utilized to injure the United States or to secure an advantage to any foreign nation . . . ." Other sections of Title 42 of the United States Code dealing with atomic energy prohibit and punish acquisition, removal, concealment, tampering with, alteration, mutilation, or destruction of documents incorporating "Restricted Data" and provide penalties for employees and former employees of the Atomic Energy Commission, the armed services, contractors and licensees of the Atomic Energy Commission. Title 42 U. S. C. §§ 2276, 2277. Title 50 U. S. C. App. § 781, 56 Stat. 390, prohibits the making of any sketch or other representation of military installations or any military equipment located on any military instal-

Congress has provided penalties ranging from a $10,000 fine to death for violating the various statutes.

Thus it would seem that in order for this Court to issue an injunction it would require a showing that such an injunction would enhance the already existing power of the Government to act. See *Bennett* v. *Laman,* 277 N. Y. 368, 14 N. E. 2d 439 (1938). It is a traditional axiom of equity that a court of equity will not do a useless thing just as it is a traditional axiom that equity will not enjoin the commission of a crime. See Z. Chafee & E. Re, Equity 935–954 (5th ed. 1967); 1 H. Joyce, Injunctions §§ 58–60a (1909). Here there has been no attempt to make such a showing. The Solicitor General does not even mention in his brief whether the Government considers that there is probable cause to believe a crime has been committed or whether there is a conspiracy to commit future crimes.

If the Government had attempted to show that there was no effective remedy under traditional criminal law, it would have had to show that there is no arguably applicable statute. Of course, at this stage this Court could not and cannot determine whether there has been a violation of a particular statute or decide the constitutionality of any statute. Whether a good-faith prosecution could have been instituted under any statute could, however, be determined.

---

lation, as specified; and indeed Congress in the National Defense Act of 1940, 54 Stat. 676, as amended, 56 Stat. 179, conferred jurisdiction on federal district courts over civil actions "to enjoin any violation" thereof. 50 U. S. C. App. § 1152 (6). Title 50 U. S. C. § 783 (b) makes it unlawful for any officers or employees of the United States or any corporation which is owned by the United States to communicate material which has been "classified" by the President to any person who that governmental employee knows or has reason to believe is an agent or representative of any foreign government or any Communist organization.

At least one of the many statutes in this area seems relevant to these cases. Congress has provided in 18 U. S. C. § 793 (e) that whoever "having unauthorized possession of, access to, or control over any document, writing, code book, signal book . . . or note relating to the national defense, or information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation, willfully communicates, delivers, transmits . . . the same to any person not entitled to receive it, or willfully retains the same and fails to deliver it to the officer or employee of the United States entitled to receive it . . . [s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both." Congress has also made it a crime to conspire to commit any of the offenses listed in 18 U. S. C. § 793 (e).

It is true that Judge Gurfein found that Congress had not made it a crime to publish the items and material specified in § 793 (e). He found that the words "communicates, delivers, transmits . . ." did not refer to publication of newspaper stories. And that view has some support in the legislative history and conforms with the past practice of using the statute only to prosecute those charged with ordinary espionage. But see 103 Cong. Rec. 10449 (remarks of Sen. Humphrey). Judge Gurfein's view of the statute is not, however, the only plausible construction that could be given. See my Brother WHITE's concurring opinion.

Even if it is determined that the Government could not in good faith bring criminal prosecutions against the New York Times and the Washington Post, it is clear that Congress has specifically rejected passing legislation that would have clearly given the President the power he seeks here and made the current activity of the newspapers unlawful. When Congress specifically declines to make conduct unlawful it is not for this Court

to redecide those issues—to overrule Congress. See *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579 (1952).

On at least two occasions Congress has refused to enact legislation that would have made the conduct engaged in here unlawful and given the President the power that he seeks in this case. In 1917 during the debate over the original Espionage Act, still the basic provisions of § 793, Congress rejected a proposal to give the President in time of war or threat of war authority to directly prohibit by proclamation the publication of information relating to national defense that might be useful to the enemy. The proposal provided that:

> "During any national emergency resulting from a war to which the United States is a party, or from threat of such a war, the President may, by proclamation, declare the existence of such emergency and, by proclamation, prohibit the publishing or communicating of, or the attempting to publish or communicate any information relating to the national defense which, in his judgment, is of such character that it is or might be useful to the enemy. Whoever violates any such prohibition shall be punished by a fine of not more than $10,000 or by imprisonment for not more than 10 years, or both: *Provided,* That nothing in this section shall be construed to limit or restrict any discussion, comment, or criticism of the acts or policies of the Government or its representatives or the publication of the same." 55 Cong. Rec. 1763.

Congress rejected this proposal after war against Germany had been declared even though many believed that there was a grave national emergency and that the threat of security leaks and espionage was serious. The Executive Branch has not gone to Congress and requested that the decision to provide such power be reconsidered. In-

stead, the Executive Branch comes to this Court and asks that it be granted the power Congress refused to give.

In 1957 the United States Commission on Government Security found that "[a]irplane journals, scientific periodicals, and even the daily newspaper have featured articles containing information and other data which should have been deleted in whole or in part for security reasons." In response to this problem the Commission proposed that "Congress enact legislation making it a crime for any person willfully to disclose without proper authorization, for any purpose whatever, information classified 'secret' or 'top secret,' knowing, or having reasonable grounds to believe, such information to have been so classified." Report of Commission on Government Security 619–620 (1957). After substantial floor discussion on the proposal, it was rejected. See 103 Cong. Rec. 10447–10450. If the proposal that Sen. Cotton championed on the floor had been enacted, the publication of the documents involved here would certainly have been a crime. Congress refused, however, to make it a crime. The Government is here asking this Court to remake that decision. This Court has no such power.

Either the Government has the power under statutory grant to use traditional criminal law to protect the country or, if there is no basis for arguing that Congress has made the activity a crime, it is plain that Congress has specifically refused to grant the authority the Government seeks from this Court. In either case this Court does not have authority to grant the requested relief. It is not for this Court to fling itself into every breach perceived by some Government official nor is it for this Court to take on itself the burden of enacting law, especially a law that Congress has refused to pass.

I believe that the judgment of the United States Court of Appeals for the District of Columbia Circuit should

be affirmed and the judgmen<sub>?</sub> of the United States Court of Appeals for the Second Circuit should be reversed insofar as it remands the case for further hearings.

MR. CHIEF JUSTICE BURGER, dissenting.

So clear are the constitutional limitations on prior restraint against expression, that from the time of *Near* v. *Minnesota,* 283 U. S. 697 (1931), until recently in *Organization for a Better Austin* v. *Keefe,* 402 U. S. 415 (1971), we have had little occasion to be concerned with cases involving prior restraints against news reporting on matters of public interest. There is, therefore, little variation among the members of the Court in terms of resistance to prior restraints against publication. Adherence to this basic constitutional principle, however, does not make these cases simple. In these cases, the imperative of a free and unfettered press comes into collision with another imperative, the effective functioning of a complex modern government and specifically the effective exercise of certain constitutional powers of the Executive. Only those who view the First Amendment as an absolute in all circumstances—a view I respect, but reject—can find such cases as these to be simple or easy.

These cases are not simple for another and more immediate reason. We do not know the facts of the cases. No District Judge knew all the facts. No Court of Appeals judge knew all the facts. No member of this Court knows all the facts.

Why are we in this posture, in which only those judges to whom the First Amendment is absolute and permits of no restraint in any circumstances or for any reason, are really in a position to act?

I suggest we are in this posture because these cases have been conducted in unseemly haste. MR. JUSTICE HARLAN covers the chronology of events demonstrating the hectic pressures under which these cases have been processed and I need not restate them. The prompt

setting of these cases reflects our universal abhorrence of prior restraint. But prompt judicial action does not mean unjudicial haste.

Here, moreover, the frenetic haste is due in large part to the manner in which the Times proceeded from the date it obtained the purloined documents. It seems reasonably clear now that the haste precluded reasonable and deliberate judicial treatment of these cases and was not warranted. The precipitate action of this Court aborting trials not yet completed is not the kind of judicial conduct that ought to attend the disposition of a great issue.

The newspapers make a derivative claim under the First Amendment; they denominate this right as the public "right to know"; by implication, the Times asserts a sole trusteeship of that right by virtue of its journalistic "scoop." The right is asserted as an absolute. Of course, the First Amendment right itself is not an absolute, as Justice Holmes so long ago pointed out in his aphorism concerning the right to shout "fire" in a crowded theater if there was no fire. There are other exceptions, some of which Chief Justice Hughes mentioned by way of example in *Near* v. *Minnesota*. There are no doubt other exceptions no one has had occasion to describe or discuss. Conceivably such exceptions may be lurking in these cases and would have been flushed had they been properly considered in the trial courts, free from unwarranted deadlines and frenetic pressures. An issue of this importance should be tried and heard in a judicial atmosphere conducive to thoughtful, reflective deliberation, especially when haste, in terms of hours, is unwarranted in light of the long period the Times, by its own choice, deferred publication.[1]

---

[1] As noted elsewhere the Times conducted its analysis of the 47 volumes of Government documents over a period of several months and did so with a degree of security that a government might envy. Such security was essential, of course, to protect the enterprise

It is not disputed that the Times has had unauthorized possession of the documents for three to four months, during which it has had its expert analysts studying them, presumably digesting them and preparing the material for publication. During all of this time, the Times, presumably in its capacity as trustee of the public's "right to know," has held up publication for purposes it considered proper and thus public knowledge was delayed. No doubt this was for a good reason; the analysis of 7,000 pages of complex material drawn from a vastly greater volume of material would inevitably take time and the writing of good news stories takes time. But why should the United States Government, from whom this information was illegally acquired by someone, along with all the counsel, trial judges, and appellate judges be placed under needless pressure? After these months of deferral, the alleged "right to know" has somehow and suddenly become a right that must be vindicated instanter.

Would it have been unreasonable, since the newspaper could anticipate the Government's objections to release of secret material, to give the Government an opportunity to review the entire collection and determine whether agreement could be reached on publication? Stolen or not, if security was not in fact jeopardized, much of the material could no doubt have been declassified, since it spans a period ending in 1968. With such an approach— one that great newspapers have in the past practiced and stated editorially to be the duty of an honorable press— the newspapers and Government might well have nar-

---

from others. Meanwhile the Times has copyrighted its material and there were strong intimations in the oral argument that the Times contemplated enjoining its use by any other publisher in violation of its copyright. Paradoxically this would afford it a protection, analogous to prior restraint, against all others—a protection the Times denies the Government of the United States.

real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend."

With all respect, I consider that the Court has been _almost irresponsibly feverish in dealing with these cases.

Both the Court of Appeals for the Second Circuit and the Court of Appeals for the District of Columbia Circuit rendered judgment on June 23. The New York Times' petition for certiorari, its motion for accelerated consideration thereof, and its application for interim relief were filed in this Court on June 24 at about 11 a. m. The application of the United States for interim relief in the *Post* case was also filed here on June 24 at about 7:15 p. m. This Court's order setting a hearing before us on June 26 at 11 a. m., a course which I joined only to avoid the possibility of even more peremptory action by the Court, was issued less than 24 hours before. The record in the *Post* case was filed with the Clerk shortly before 1 p. m. on June 25; the record in the *Times* case did not arrive until 7 or 8 o'clock that same night. The briefs of the parties were received less than two hours before argument on June 26.

This frenzied train of events took place in the name of the presumption against prior restraints created by the First Amendment. Due regard for the extraordinarily important and difficult questions involved in these litigations should have led the Court to shun such a precipitate timetable. In order to decide the merits of these cases properly, some or all of the following questions should have been faced:

1. Whether the Attorney General is authorized to bring these suits in the name of the United States. Com-

pare *In re Debs,* 158 U. S. 564 (1895), with *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579 (1952). This question involves as well the construction and validity of a singularly opaque statute—the Espionage Act, 18 U. S. C. § 793 (e).

2. Whether the First Amendment permits the federal courts to enjoin publication of stories which would present a serious threat to national security. See *Near* v. *Minnesota,* 283 U. S. 697, 716 (1931) (dictum).

3. Whether the threat to publish highly secret documents is of itself a sufficient implication of national security to justify an injunction on the theory that regardless of the contents of the documents harm enough results simply from the demonstration of such a breach of secrecy.

4. Whether the unauthorized disclosure of any of these particular documents would seriously impair the national security.

5. What weight should be given to the opinion of high officers in the Executive Branch of the Government with respect to questions 3 and 4.

6. Whether the newspapers are entitled to retain and use the documents notwithstanding the seemingly uncontested facts that the documents, or the originals of which they are duplicates, were purloined from the Government's possession and that the newspapers received them with knowledge that they had been feloniously acquired. Cf. *Liberty Lobby, Inc.* v. *Pearson,* 129 U. S. App. D. C. 74, 390 F. 2d 489 (1967, amended 1968).

7. Whether the threatened harm to the national security or the Government's possessory interest in the documents justifies the issuance of an injunction against publication in light of—

a. The strong First Amendment policy against prior restraints on publication;

b. The doctrine against enjoining conduct in violation of criminal statutes; and

c. The extent to which the materials at issue have apparently already been otherwise disseminated.

These are difficult questions of fact, of law, and of judgment; the potential consequences of erroneous decision are enormous. The time which has been available to us, to the lower courts,* and to the parties has been wholly inadequate for giving these cases the kind of consideration they deserve. It is a reflection on the stability of the judicial process that these great issues— as important as any that have arisen during my time on the Court—should have been decided under the pressures engendered by the torrent of publicity that has attended these litigations from their inception.

Forced as I am to reach the merits of these cases, I dissent from the opinion and judgments of the Court. Within the severe limitations imposed by the time-constraints under which I have been required to operate, I can only state my reasons in telescoped form, even though in different circumstances I would have felt constrained to deal with the cases in the fuller sweep indicated above.

It is a sufficient basis for affirming the Court of Appeals for the Second Circuit in the *Times* litigation to observe that its order must rest on the conclusion that because of the time elements the Government had not been given an adequate opportunity to present its case

---

*The hearing in the *Post* case before Judge Gesell began at 8 a. m. on June 21, and his decision was rendered, under the hammer of a deadline imposed by the Court of Appeals, shortly before 5 p. m. on the same day. The hearing in the *Times* case before Judge Gurfein was held on June 18 and his decision was rendered on June 19. The Government's appeals in the two cases were heard by the Courts of Appeals for the District of Columbia and Second Circuits, each court sitting *en banc*, on June 22. Each court rendered its decision on the following afternoon.

to the District Court. At the least this conclusion was not an abuse of discretion.

In the *Post* litigation the Government had more time to prepare; this was apparently the basis for the refusal of the Court of Appeals for the District of Columbia Circuit on rehearing to conform its judgment to that of the Second Circuit. But I think there is another and more fundamental reason why this judgment cannot stand—a reason which also furnishes an additional ground for not reinstating the judgment of the District Court in the *Times* litigation, set aside by the Court of Appeals. It is plain to me that the scope of the judicial function in passing upon the activities of the Executive Branch of the Government in the field of foreign affairs is very narrowly restricted. This view is, I think, dictated by the concept of separation of powers upon which our constitutional system rests.

In a speech on the floor of the House of Representatives, Chief Justice John Marshall, then a member of that body, stated:

> "The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations." 10 Annals of Cong. 613 (1800).

From that time, shortly after the founding of the Nation, to this, there has been no substantial challenge to this description of the scope of executive power. See *United States* v. *Curtiss-Wright Corp.*, 299 U. S. 304, 319–321 (1936), collecting authorities.

From this constitutional primacy in the field of foreign affairs, it seems to me that certain conclusions necessarily follow. Some of these were stated concisely by President Washington, declining the request of the House of Representatives for the papers leading up to the negotiation of the Jay Treaty:

> "The nature of foreign negotiations requires caution, and their success must often depend on secrecy;

and even when brought to a conclusion a full disclosure of all the measures, demands, or eventual concessions which may have been proposed or contemplated would be extremely impolitic; for this might have a pernicious influence on future negotiations, or produce immediate inconveniences, perhaps danger and mischief, in relation to other powers." 1 J. Richardson, Messages and Papers of the Presidents 194–195 (1896).

The power to evaluate the "pernicious influence" of premature disclosure is not, however, lodged in the Executive alone. I agree that, in performance of its duty to protect the values of the First Amendment against political pressures, the judiciary must review the initial Executive determination to the point of satisfying itself that the subject matter of the dispute does lie within the proper compass of the President's foreign relations power. Constitutional considerations forbid "a complete abandonment of judicial control." Cf. *United States* v. *Reynolds,* 345 U. S. 1, 8 (1953). Moreover, the judiciary may properly insist that the determination that disclosure of the subject matter would irreparably impair the national security be made by the head of the Executive Department concerned—here the Secretary of State or the Secretary of Defense—after actual personal consideration by that officer. This safeguard is required in the analogous area of executive claims of privilege for secrets of state. See *id.,* at 8 and n. 20; *Duncan* v. *Cammell, Laird & Co.,* [1942] A. C. 624, 638 (House of Lords).

But in my judgment the judiciary may not properly go beyond these two inquiries and redetermine for itself the probable impact of disclosure on the national security.

"[T]he very nature of executive decisions as to foreign policy is political, not judicial. Such de-

cisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry." *Chicago & Southern Air Lines* v. *Waterman Steamship Corp.,* 333 U. S. 103, 111 (1948) (Jackson, J.).

Even if there is some room for the judiciary to override the executive determination, it is plain that the scope of review must be exceedingly narrow. I can see no indication in the opinions of either the District Court or the Court of Appeals in the *Post* litigation that the conclusions of the Executive were given even the deference owing to an administrative agency, much less that owing to a co-equal branch of the Government operating within the field of its constitutional prerogative.

Accordingly, I would vacate the judgment of the Court of Appeals for the District of Columbia Circuit on this ground and remand the case for further proceedings in the District Court. Before the commencement of such further proceedings, due opportunity should be afforded the Government for procuring from the Secretary of State or the Secretary of Defense or both an expression of their views on the issue of national security. The ensuing review by the District Court should be in accordance with the views expressed in this opinion. And for the reasons stated above I would affirm the judgment of the Court of Appeals for the Second Circuit.

Pending further hearings in each case conducted under the appropriate ground rules, I would continue the

restraints on publication. I cannot believe that the doctrine prohibiting prior restraints reaches to the point of preventing courts from maintaining the *status quo* long enough to act responsibly in matters of such national importance as those involved here.

MR. JUSTICE BLACKMUN, dissenting.

I join MR. JUSTICE HARLAN in his dissent. I also am in substantial accord with much that MR. JUSTICE WHITE says, by way of admonition, in the latter part of his opinion.

At this point the focus is on *only* the comparatively few documents specified by the Government as critical. So far as the other material—vast in amount—is concerned, let it be published and published forthwith if the newspapers, once the strain is gone and the sensationalism is eased, still feel the urge so to do.

But we are concerned here with the few documents specified from the 47 volumes. Almost 70 years ago Mr. Justice Holmes, dissenting in a celebrated case, observed:

> "Great cases like hard cases make bad law. For great cases are called great, not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure . . . ." *Northern Securities Co.* v. *United States,* 193 U. S. 197, 400–401 (1904).

The present cases, if not great, are at least unusual in their posture and implications, and the Holmes observation certainly has pertinent application.

The New York Times clandestinely devoted a period of three months to examining the 47 volumes that came into its unauthorized possession. Once it had begun publi-

cation of material from those volumes, the New York case now before us emerged. It immediately assumed, and ever since has maintained, a frenetic pace and character. Seemingly, once publication started, the material could not be made public fast enough. Seemingly, from then on, every deferral or delay, by restraint or otherwise, was abhorrent and was to be deemed violative of the First Amendment and of the public's "right immediately to know." Yet that newspaper stood before us at oral argument and professed criticism of the Government for not lodging its protest earlier than by a Monday telegram following the initial Sunday publication.

The District of Columbia case is much the same.

Two federal district courts, two United States courts of appeals, and this Court—within a period of less than three weeks from inception until today—have been pressed into hurried decision of profound constitutional issues on inadequately developed and largely assumed facts without the careful deliberation that, one would hope, should characterize the American judicial process. There has been much writing about the law and little knowledge and less digestion of the facts. In the New York case the judges, both trial and appellate, had not yet examined the basic material when the case was brought here. In the District of Columbia case, little more was done, and what was accomplished in this respect was only on required remand, with the Washington Post, on the excuse that it was trying to protect its source of information, initially refusing to reveal what material it actually possessed, and with the District Court forced to make assumptions as to that possession.

With such respect as may be due to the contrary view, this, in my opinion, is not the way to try a lawsuit of this magnitude and asserted importance. It is not the way for federal courts to adjudicate, and to be required to adjudicate, issues that allegedly concern the Nation's

vital welfare. The country would be none the worse off were the cases tried quickly, to be sure, but in the customary and properly deliberative manner. The most recent of the material, it is said, dates no later than 1968, already about three years ago, and the Times itself took three months to formulate its plan of procedure and, thus, deprived its public for that period.

The First Amendment, after all, is only one part of an entire Constitution. Article II of the great document vests in the Executive Branch primary power over the conduct of foreign affairs and places in that branch the responsibility for the Nation's safety. Each provision of the Constitution is important, and I cannot subscribe to a doctrine of unlimited absolutism for the First Amendment at the cost of downgrading other provisions. First Amendment absolutism has never commanded a majority of this Court. See, for example, *Near* v. *Minnesota,* 283 U. S. 697, 708 (1931), and *Schenck* v. *United States,* 249 U. S. 47, 52 (1919). What is needed here is a weighing, upon properly developed standards, of the broad right of the press to print and of the very narrow right of the Government to prevent. Such standards are not yet developed. The parties here are in disagreement as to what those standards should be. But even the newspapers concede that there are situations where restraint is in order and is constitutional. Mr. Justice Holmes gave us a suggestion when he said in *Schenck,*

> "It is a question of proximity and degree. When a nation is at war many things that might be said in time of peace are such a hindrance to its effort that their utterance will not be endured so long as men fight and that no Court could regard them as protected by any constitutional right." 249 U. S., at 52.

I therefore would remand these cases to be developed expeditiously, of course, but on a schedule permitting the

orderly presentation of evidence from both sides, with the use of discovery, if necessary, as authorized by the rules, and with the preparation of briefs, oral argument, and court opinions of a quality better than has been seen to this point. In making this last statement, I criticize no lawyer or judge. I know from past personal experience the agony of time pressure in the preparation of litigation. But these cases and the issues involved and the courts, including this one, deserve better than has been produced thus far.

It may well be that if these cases were allowed to develop as they should be developed, and to be tried as lawyers should try them and as courts should hear them, free of pressure and panic and sensationalism, other light would be shed on the situation and contrary considerations, for me, might prevail. But that is not the present posture of the litigation.

The Court, however, decides the cases today the other way. I therefore add one final comment.

I strongly urge, and sincerely hope, that these two newspapers will be fully aware of their ultimate responsibilities to the United States of America. Judge Wilkey, dissenting in the District of Columbia case, after a review of only the affidavits before his court (the basic papers had not then been made available by either party), concluded that there were a number of examples of documents that, if in the possession of the Post, and if published, "could clearly result in great harm to the nation," and he defined "harm" to mean "the death of soldiers, the destruction of alliances, the greatly increased difficulty of negotiation with our enemies, the inability of our diplomats to negotiate . . . ." I, for one, have now been able to give at least some cursory study not only to the affidavits, but to the material itself. I regret to say that from this examination I fear that Judge Wilkey's statements have possible foundation. I therefore share

his concern. I hope that damage has not already been done. If, however, damage has been done, and if, with the Court's action today; these newspapers proceed to publish the critical documents and there results therefrom "the death of soldiers, the destruction of alliances, the greatly increased difficulty of negotiation with our enemies, the inability of our diplomats to negotiate," to which list I might add the factors of prolongation of the war and of further delay in the freeing of United States prisoners, then the Nation's people will know where the responsibility for these sad consequences rests.