In re I.G. SERVICES LTD.,
Putative Debtor.

In re I.W.G. Services Ltd.,
Putative Debtor.

In re Petition of Len B. Blackwell for the Estates I.G. Services Ltd., Debtors in Foreign Proceedings, Foreign Representative.

In re Petition of Christopher J. Hughes for the Estates of IWG Services, Ltd., Debtors in Foreign Proceedings, Foreign Representative.

Bankruptcy Nos. 99–53169–C to 99–53172.

United States Bankruptcy Court, W.D. Texas, San Antonio Division.

Jan. 18, 2000.

MEMORANDUM OPINION AND ORDER DENYING MOTION TO VACATE CONFIDENTIALITY ORDER AND DENYING MOTION FOR RECONSIDERATION OF THE COURT'S ORDER SEALING A PORTION OF THE RECORD

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for consideration the following related motions filed by San Antonio Express News, a unit of Hearst Newspapers, L.P., and Darrin Schlegel, business editor for the San Antonio Express Newspaper (the "Movants"):

(1) Motion to Vacate the Court's Order Granting Motion to Protect Confidentiality of the Identities of Investors; and

(2) Motion for Reconsideration of the Court's Order Sealing a Portion of the Record.

After considering the briefs filed by the parties (including the responsive briefs of certain investors), the court concludes that both of the above motions are without merit and should be denied. Accordingly, the court's order granting motion to protect confidentiality and the order sealing a portion of the record shall stand.

## I. BACKGROUND

This dispute arises in the context of a rather extraordinary bankruptcy filing. A group of entities collectively known as Inverworld encountered deep financial difficulties in mid–1999. As a result, two of those entities, I.G. Services, Ltd., a Cayman Islands entity, and I.W.G. Services, Ltd., a United Kingdom entity, commenced insolvency proceedings under the respective laws of the countries of their incorporation. The liquidators in both cases are PriceWaterhouseCoopers (PWC).[1] PWC promptly sought and ob-

---

1. The court will not here attempt to detail the procedures for opening proceedings and ap- pointing official representatives in the Cayman Islands and the United Kingdom. The

tained ancillary relief in this court pursuant to section 304 of the U.S. Bankruptcy Code, primarily to bring to a halt mounting collection activity against the two entities by frustrated investors.[2] Some investors filed petitions for involuntary bankruptcy under the U.S. Bankruptcy Code against these self-same entities (these petitions, by agreement of all parties, have not yet been ruled on). About a month afterward, a federal receivership was opened in U.S. District Court by the Securities & Exchange Commission. Other federal agencies entered appearances in that proceeding as well. As a result, there were, as of mid-August 1999, proceedings involving one or more Inverworld entities in four different courts and three different countries.[3]

One issue which early emerged in the case was a professed fear on the part of numerous investors in Mexico (who form the bulk of the investor community in this case) that disclosure of their identities might subject them to physical violence in Mexico, due to a spate of violent kidnappings and murders of wealthy individuals in Mexico in recent years. In most cases, creditors and other participants in a bankruptcy process (at least in the United States) file paperwork that reveals their names and addresses, and such filings become part of a public record that can be inspected by anyone. The investors, through counsel, explained that investors might find themselves faced with

a Hobson's choice—needing to actively participate in the bankruptcy proceedings in order to protect their rather significant financial interests, but fearing that to do so might subject them to personal injury or death. The court, with the agreement of the liquidators, on the record suggested that the investors file a motion setting out their concerns in writing, so that the court could evaluate the request and enter appropriate orders.

On August 23, 1999, counsel on behalf of a large group of investors filed just such a motion, and on August 27, 1999, the court entered an Order Granting the Motion to Protect Confidentiality of Investors (the "Confidentiality Order"), based upon the court's review of the moving papers. The Confidentiality Order provides in part that the identities of Investors are protected by the following relevant provisions:

(1) Notices required to be filed pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure need not disclose the names and addresses of the investors;

(2) Proofs of claim, notices, and other documents may be filed using only account numbers of the investors, and utilizing the address of counsel;

(3) The disclosure of the identity or address of any investor to any party or governmental agency is prohibited, absent a specific order.

"broad brush" description offered here serves only to give the unacquainted reader a passing familiarity with the background that led up to the issues presented in this particular opinion.

2. Inverworld for many years enjoyed great success marketing investment services to wealthy persons in Mexico, employing the contacts of its founder, Jose Zolino. In the past year, for reasons that are currently the subject of intense investigation by the liquidators, the investors, and various federal agencies, the investment business turned suddenly sour. The most recent report of the liquidators is that PWC has been able thus far to locate only $108 million of more than $450 million in investments.

3. This court strongly recommended to all parties that they promptly pursue negotiation of a "protocol" to guide all parties and courts through the process with a minimum of conflicts and misunderstandings. The court was especially concerned about jurisdictional disputes among competing courts, unnecessarily high administration costs as a result of multiple forums, and the like. Early reports already indicated that the case could hardly afford such internecine warfare. The parties responded with a draft protocol, which has been approved by the court in the Cayman Islands and by the U.S. District Court presiding over the receivership.

On September 29, 1999, the Movants filed a Motion to Vacate the Confidentiality Order (the "Motion to Vacate"), claiming that the Confidentiality Order: (1) violated constitutional law, common law, and the statutory rights of the newspaper as well as the rights of the general public; (2) violated Bankruptcy Code § 107(b) and Bankruptcy Rule 9018 because the Confidentiality Order did not involve one of the enumerated reasons for issuing a protective order; and (3) the Confidentiality Order was entered without a showing of good cause.[4] The investors filed a Response to the Motion to Vacate, and on November 17, 1999, the court conducted an evidentiary hearing on the Motion to Vacate. At the hearing the Movants argued that the investors were required to provide a nexus between disclosure of the identities of investors and a heightened threat of violence in Mexico in order to support entry of the Confidentiality Order. To provide that nexus, the investors first presented a series of affidavits (reviewed *in camera* to protect the identity of the investors) and the representations of their attorneys, to the effect that investors (well over 100 at the very least) feared for their safety if their identities were disclosed, and would refuse to participate in the case if the price of participation was disclosure of their identities. The investors next sought to establish a nexus between these asserted fears and the acknowledged climate of violence in Mexico (supported by numerous newspaper accounts, including one account of a reporter from the *Express–News* who was murdered in Mexico City in the last 18 months). They called a witness who had personal knowledge of the violence in Mexico and of the fears of investors. The witness specifically adverted to the experience of one investor who, shortly after publicly claiming to have a significant investment in the Inverworld case, was accosted by armed gunmen and escaped only because the vehicle in which he was riding was bulletproof. At the conclusion of this testimony, the court granted the request of the investors that this testimony be sealed, to protect the identity of the witness and the identity of other persons who are related to the witness, subsequently memorializing its bench ruling in a written order (the "Sealing Order") entered November 22, 1999.[5] Subsequently, at the invitation of the court, the parties filed post-hearing briefs addressing the Motion to Vacate. On December 2, 1999, the Movants also filed a Motion for Reconsideration (the "Motion for Reconsideration") of the court's Sealing Order. Because the Mo-

---

4. In their Motion to Vacate the Protective Order, the Movants first argued that they have a "general right to inspect and copy public records and documents, including judicial records and documents." *See Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). Second, the Movants asserted that Bankruptcy Code § 107 and Bankruptcy Rule 2019 are the only limits that the bankruptcy court can impose on public access to court records. Third, they argued that the court does not have the authority to issue a confidentiality order under Code § 105 because to do so would create a substantive right not otherwise available under the Bankruptcy Code, and would also contradict the express language of § 107 and Rule 2018. Fourth, for the same reason, Rule 1007(j) is not available as a means for issuing a protective order because it would enlarge and/or modify a substantive right. Fifth, Rule 7026 is inapplicable as grounds because it only applies to discovery.

5. The court noted in so ruling that it preferred not to risk the life of either the witness or the witness's relatives on the theory of the Movants that no danger was posed to the witness or his relatives. The very testimony that, in the opinion of the court, justified maintaining the Confidentiality Order (*i.e.,* testimony demonstrating an actual nexus between the violence in Mexico and the fears of the investors regarding their personal safety) perforce justified protecting the witness who came forward to give the testimony. If the evidence established a real danger, only a cold-hearted perversity could justify exposing the witness to the very danger the witness's own testimony disclosed. The Movants opposed sealing the testimony, evidently preferring to test their theory of the case by seeing whether, in fact, anything bad happened to either the witness or the witness's relatives as a result of the publication of the witness's identity.

tion to Vacate and the Motion for Reconsideration are so closely related, we consider and decide them both here.

## II. ANALYSIS

### A. Motion to Vacate the Court's Order Granting Motion to Protect Confidentiality of the Identities of Investors

### 1. The Confidentiality Order Does Not Violate the First Amendment

■ The court's order granting the motion to protect confidentiality of the identity of investors should stand, for two reasons. Firstly, the Order does not even bar access to court records. Instead, it regulates what information is required to be *made* of record. The First Amendment does not give the press the right to insist that information be *placed* into the public record and if a court, in the administration of justice, determines that certain information need not be placed of record, it has not infringed on the press' First Amendment rights. *See Branzburg v. Hayes,* 408 U.S. 665, 684, 92 S.Ct. 2646, 2658, 33 L.Ed.2d 626 (1972) (there is no constitutional right to of special access to information not available to the public generally); *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976) (the right to publish does not carry with it the unrestrained right to gather information).

Secondly, assuming that access to public records *is* the issue presented by this court's Order, ample cause exists on the facts of this case to bar access to those records, under the authority of *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 609, 98 S.Ct. 1306, 1318, 55 L.Ed.2d 570 (1978).

### a. The Confidentiality Order does not Bar Access to Court Records

Both parties couched their arguments to the court at hearing on their assumption that the controlling authority regarding the propriety of the court's Confidentiality Order was *Nixon v. Warner Communications, Inc.* In that case, the Supreme Court adverted to long-standing authority to the effect that the press and the public share a "general right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597, 98 S.Ct. 1306, 1312, 55 L.Ed.2d 570 (1978). The Court went on to explain that this right is not absolute, and that access may be denied in the prudent exercise of a trial court's "sound discretion,"— "a discretion to be exercised in light of the relevant facts and circumstances of the particular case." *Id.,* 435 U.S., at 599, 98 S.Ct., at 1312.

■ The presumption that underlies the invocation of *Nixon,* however, is that there are public records already in existence, access to which is being denied. In this case, there are no public records to which the press is being denied access. The effect of the court's Confidentiality Order is to *excuse* investor parties to these bankruptcy proceedings from ever having to *place* the information at issue into the public records in the first place. The Order more closely partakes of rulings that protect the identity of informants from being disclosed, *i.e.,* made of record in a court proceeding. What Movants thus actually insist is that the information in question must be *made* public.

There are two ways that Movants' arguments might be phrased. One is that the court must be enlisted in *aiding* the press to *gather* information. The other is that the court may not alter any of the rules and forms that might impose a disclosure obligation, for to do so impedes the press in its information-gathering process. Under either formulation, however, the Movants do not enjoy unbridled First Amendment protection (if they enjoy any First Amendment entitlements at all).

■ The Supreme Court has expressly rejected the first formulation of Movants' position. In *Elrod v. Burns,* the Court held that "the right to speak and publish does not carry with it the unrestrained

right to gather information." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976). Furthermore, "the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Branzburg v. Hayes*, 408 U.S. 665, 684, 92 S.Ct. 2646, 2658, 33 L.Ed.2d 626 (1972). The First Amendment simply does not require the courts to become "stringers" for the press.

The second formulation carries with it certain unarticulated assumptions that are in fact not warranted. Movants in essence contend that the court may not alter or modify any of the rules or forms that, in the usual case, would disclose the identity of the investors. The assumption underlying this contention is that these rules and forms operate for the benefit of the public and the public's "right to know." That assumption lacks foundation, however. Rule 2019 of the Federal Rules of Bankruptcy Procedure, for example, was not promulgated to assure the public access to the identity of creditor or investor entities, but rather "to prevent improper participation in a reorganization case by attorneys representing creditors and stockholders." Editor's Comment to Rule 2019, NORTON BANKRUPTCY RULES PAMPHLET 1999–2000 Ed., at 158. The 1983 Advisory Committee Note to the Rule describes it as "a comprehensive regulation of representation in ... a chapter 11 reorganization case." *Id.* The Movants do not suggest any such "improper participation" in this case, nor would they likely have standing to complain about such "improper participation" in any event. Movants want to know the identity of the investors so they can publish that information. They have no interest in "protecting" the investors from "improper representation."

The suggestion that the court cannot alter the ambit of Rule 2019 relies on the assumption that the rule is there so that the press can know the identity of persons being represented in a bankruptcy case. The assumption, obviously, is wrong. Because the assumption is wrong, so also is Movants' argument. To hold otherwise would give the press standing which it does not enjoy, and would impose an unwritten duty on courts that, when they administer their cases, they must ever be mindful that they are servants of the press. The Supreme Court has firmly rejected such a notion in, of all cases, *Nixon v. Warner Communications, Inc.*

> The First Amendment generally grants the press no right to information about a trial superior to that of the general public. "Once beyond the confines of the courthouse, a news-gathering agency may publicize, within wide limits, What its representatives have heard and seen in the courtroom. But the line is drawn at the courthouse door; and within, a reporter's constitutional rights are no greater than those of any other member of the public." *Estes v. Texas*, 381 U.S. 532, 589, 85 S.Ct. 1628, 1663, 14 L.Ed.2d 543 (1965) (Harlan, J., concurring).

*Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 609, 98 S.Ct. 1306, 1318, 55 L.Ed.2d 570 (1978).

A similar observation applies to the second provision of the Confidentiality Order, which permits proofs of claim and other papers to be filed using an identifying number in lieu of the actual names of investors. Proof of claim forms contain information designed to aid in the administration of the estate—telling the disbursing entity (usually a trustee) to whom monies are to be paid. 9 COLLIER ON BANKRUPTCY, ¶ 3001.02 (Matthew Bender 15th ed.1997) ("it is the proof of claim which provides the basis of *creditor participation* in a case"). Rule 3001 states that proofs of claim are to conform "substantially" to the official form for proofs of claim, and does not by its own terms expressly require a disclosure of the identity of claimant. *Id.*, ¶ 3001.01. A proof of claim form includes a place for the identity of the claimant to be disclosed. However, forms do not themselves have the force of law. *In re Simmons*, 237

B.R. 672, 675 (Bankr.N.D.Ill.1999). Procedures and forms for claiming against a bankruptcy estate may be established by the court in special circumstances. *Id.,* ¶ 3001.01 n. 2 (citing *In re A.H. Robins Co., Inc.,* 862 F.2d 1092 (4th Cir.1988)).

The press (and the public, for that matter) have no vested entitlement to the actual identity of claimants participating in a bankruptcy distribution that can be traced to the format of proofs of claim, the primary function of which is to assure proper administration of a bankruptcy estate. Nor can such an entitlement be traced to Rule 3001, which simply specifies the overall content of a form the primary purpose of which is to provide a basis for creditor participation in the case. The purpose of the proof of claim process is not to furnish information to the public but to furnish information to the trustee in bankruptcy. The proofs of claim once filed are public information, but the public has no right to *dictate* what information is included in the proof of claim. Neither, therefore, does the press. The same analysis applies to other papers filed in the bankruptcy case on behalf of the investors.

■ The third provision of the court's Confidentiality Order barred disclosure of investor identities and addresses, absent a court order authorizing such disclosure. This provision functions similarly to a "gag order" applied to parties to litigation,[6] and comes closest to raising real First Amendment concerns. The Second Circuit has held that such orders, directed at parties and challenged by a third party, does not operate as a prior restraint and is permis-

sible so long as it is justifiable. *In re Application of Dow Jones & Co.,* 842 F.2d 603, 608–09 (2nd Cir.1988). In that case, the court found that a gag order was permissible because the defendants' Sixth Amendment rights trumped the press' First Amendment claims. Our case does not involve a balancing of competing constitutional rights. Instead it balances the Movants' asserted First Amendment entitlements against the far more basic human right to be free from physical violence or death. The restraint on speech that the "gag order" feature of this Court's Confidentiality Order imposes is easily justified by the court's finding (supported by the evidentiary record) that there is a reasonable likelihood that investors might be subjected to physical attack if their identities are published. *Id.,* at 610.[7] The court can perceive no other, less restrictive alternative to such an order to both assure the active participation of legitimate claimants in the case while still being able to reassure them that the price of such participation will not be their personal safety. The Movants have suggested no such alternative either.

In sum, the first two provisions of the Confidentiality Order modify the way in which this case is administered, in a fashion designed to maximize participation while still achieving the ends that are contemplated by the bankruptcy rules. Because those rules were enacted for the benefit of due administration of the estate, and not for the benefit of the public's "right to know," modifications of those provisions does not impinge on any press enti-

---

6. One could read the third provision broadly to bar "disclosure" by *anyone* under any circumstances, but that reading is not what the court intends. In any event, the order construed that way *would* constitute an impermissible prior restraint. The third provision does not bar disclosure of the identity or address of any investor by entities not parties to these proceedings (who presumably would obtain that information from a source independent of the court process or any party to these proceedings).

7. One issue in *Dow Jones* was the propriety of the court's guarding the secrecy of grand jury proceedings. The court's observations there are telling in the context of the facts of our case:

> Several policy concerns militate strongly in favor of maintaining the secrecy of grand jury proceedings. Otherwise, targets learning of their possible indictment might flee or tamper with grand jury witnesses. Witnesses would be less willing to appear and testify for fear of reprisal....

*Id.,* at 611.

tlements (because there are no press entitlements created by these rules). The court's order *excusing* investors from having to disclose their identities (or more accurately, excusing investors' agents, their attorneys, from having to disclose their client's identities) alters the manner in which these cases are administered. It does not alter any asserted "entitlement" to this information because the rules in question were not enacted for the purpose of the public's right to know. The press may well *use* proofs of claim and notices of appearance by counsel as sources of information, but they are not as a result entitled to insist that they be *furnished* with news sources by the court. *Elrod v. Burns, supra; Branzburg v. Hayes, supra.*

The third provision of the Confidentiality Order is justified under the test announced in *Dow Jones, supra. See also News–Journal Corp. v. Foxman*, 939 F.2d 1499, 1512 (11th Cir.1991) (citing *Dow Jones* with approval).

The court believes that, on these grounds alone, the Confidentiality Order easily passes muster under the First Amendment. Movants are no doubt frustrated that one of their sources may not be available as a result of this court's ruling, but the First Amendment does not compel this court to either be a news source or to furnish a news source for the press.

### b. There is "Good Cause" for Entry of the Confidentiality Order

Assuming that *Nixon* does apply to this case (and this court believes it does not, as

detailed above),[8] the Confidentiality Order is still justified, based on the facts and circumstances presented by this particular case.

 It is undisputed that, through their Motion to Vacate the Confidentiality Order, the Movants are seeking disclosure of the identities of the investors.[9] The Movants do not have an absolute First Amendment or common law right to disclosure of the investors' names. Case law clearly establishes that the press has no greater right of access to public records than does the general public. *See Branzburg v. Hayes*, 408 U.S. 665, 684, 92 S.Ct. 2646, 2658, 33 L.Ed.2d 626 (1972); *In re Express–News Corp.*, 695 F.2d 807, 809 (5th Cir.1982). Both the Supreme Court and the Fifth Circuit have held that the public's right of access to court proceedings, while broad, is far from absolute. *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978); *In re Express–News Corp.*, 695 F.2d 807, 810 (5th Cir.1982). In *Nixon v. Warner Communications, Inc.*, the Supreme Court said,

"It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents. [I]t is uncontested, however, *that the right to inspect and copy judicial records is not absolute. Every*

---

8. The issue presumes that the identity of investors is already contained in the court's records, and that the Confidentiality Order is barring access to the material in those records. As noted in the previous section, a thorough and diligent search of this court's records will yield nothing to Movants or anyone else, because there are no records in this court's files containing the identity of investors in these cases. Nonetheless, we indulge the fiction that this data *is* on file, solely to demonstrate that, even if investors *were* required to place this information into the court record, the court would still be justified in barring access to that information on the facts of this case.

9. The newspaper deems this information newsworthy. Movants also argued that perhaps Mexican authorities might be interested in the identities of investors, in order to pursue persons who may be trying to evade Mexican tax and currency regulations. That argument carries no legal force whatsoever, however, as the Constitution certainly does not guarantee access to information by persons who are *not* citizens of the United States—and foreign governments are not even persons, much less citizens. Moreover, the Movants—an independent newspaper and one of its editors—cannot purport to be representing the interests of the Mexican government.

*court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes.* For example, the common-law right of inspection has bowed before the power of a court to insure that its records are not "used to gratify private spite or promote public scandal" through the publication of "the painful and sometimes disgusting details of a divorce case." Similarly, courts have refused to permit their files to serve as reservoirs of libelous statements for press consumption, or as sources of business information that might harm a litigant's competitive standing."

*Nixon,* 435 U.S. at 599, 98 S.Ct. at 1312 (emphasis added). The *Nixon* court added:

"It is difficult to distill from the relatively few judicial decisions a comprehensive definition of what is referred to as the common-law right of access or to identify all the factors to be weighed in determining whether access is appropriate. The few cases that have recognized such a right do agree that *the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case.*"

*Nixon,* 435 U.S. at 599, 98 S.Ct. at 1312 (emphasis added); *see also Belo Broadcasting Corp. v. Clark,* 654 F.2d 423 (5th Cir.1981).

▆▆▆ The right to access to the names of the investors in this case is justifiably restricted because it is likely that disclosure of the names will lead to a chilling of investor participation in the case, to the substantial detriment of both those investors and the estates' liquidators. That alone is sufficient justification for the

court's limiting access to this information, given the nature of bankruptcy proceedings. Insolvency proceedings in any nation are collective in nature, and work best when all affected parties actively participate. This court's order aimed (and aims) to encourage that participation by removing an impediment—the asserted fears of investors that disclosure of their identities might subject them to personal danger.[10] That alone is sufficient cause under *Nixon.*

But that is not the only cause in this case. For, in addition, the court took evidence suggesting that investors' fears have a basis in fact. At least one investor found himself the target of a terrorist attack shortly after his identity became public. The court need not find as a matter of law that there was a causal connection between the two events. It is enough that there is a sufficient *likelihood* of a causal connection to warrant protecting investors from the *possibility* of personal injury or death. Weighing the potential that the newspaper might not be able to print a story of interest against the potential that someone might be killed, this court has little difficulty reaching what should be an obvious conclusion to any human being—discretion is the better part of valor.

And, just as important, these investors will, in this court's view, justifiably refuse to participate in this case—even to the point of walking away from millions of dollars in recoveries—rather than risk personal injury or death. Creditor participation ought never have to carry so high a price. The facts of this case easily warrant the exercise of the discretion to which the Supreme Court adverted in *Nixon.* Each new case presents a new collection of facts, requiring a new "policy choice." The Supreme Court did not pretend to describe the universe of scenarios to which that discretion ought to be applied in *Nixon.* Instead, the Court noted, as earlier

**10.** Even if the primary motivation for investors' seeking anonymity in those proceedings is to avoid detection by Mexican authorities, as the Movants suggest, this court's order encourages participation by removing that impediment. One has to question what standing the Movants would have to advance the interests of Mexican authorities in a U.S. bankruptcy court as grounds for disclosure of investor identities in any event.

quoted, that "... the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." *Nixon,* 435 U.S., at 599, 98 S.Ct., at 1312.

The Movants insisted that there was no evidence before the court supporting the issuance of the Confidentiality Order other than "conclusory statements about ambiguous concerns for safety". According to the Movants, the news articles, the travel warning published by the U.S. Government via the State Department, and the testimony of the protected witness merely describe a general climate of violence in Mexico against person who are wealthy. According to the Movants, the evidence does not show a specific risk to any investor. Movants' view of the evidence is substantially at odds with the evidence itself. Apparently, only blood on the streets will satisfy the *Express–News.* In the view of this court, nothing in the Constitution requires such a price to be paid.

■ The Movants also contend that the scope of the Confidentiality Order is excessively broad. The court disagrees. The Confidentiality Order in this case has been narrowly tailored to prevent a substantial threat to the administration of justice. *See In re Express–News Corp.,* 695 F.2d 807, 810 (5th Cir.1982). The Confidentiality Order was narrowly tailored to encourage full participation by the investors because participation by the investors is necessary to successfully bring closure to this case, and that participation could not be expected if investors feared personal injury if they had to disclose their identities for they or their attorneys to participate in the case. The Confidentiality Order issued in this case was based on a careful balancing of the public's interest in full disclosure, the safety, protection and well-being of the investors, and the orderly administration of the bankruptcy process.

The evidence presented also establishes a sufficient nexus between these proceedings and the potential risk for violence to the investors. The Movant's argument seems to require a death or violent act to an identifiable investor before a nexus is established. We believe that the United States Supreme Court eloquently framed the issue in *Nebraska Press Ass'n v. Stuart:* "the gravity of the 'evil,' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger." *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 562, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). The evil present in this case (physical danger and possible death of the investors and/or their families) easily outweighs the right of the Movants to gather news. The alternative was that the court roll the dice, terminate the Confidentiality Order, and take the risk that the investors and/or their families will be harmed or even killed—or, as is far more likely, that they walk away from millions of dollars of claims rather than face that risk.[11] In circumstances such as these, limits on public access are entirely justified to assure the fair administration of justice. We do not believe that the First Amendment requires that innocent persons' lives be endangered simply to test a newspaper's theory of the events of this case.[12]

For all the foregoing reasons, the court's exercise of its discretion in entering the Confidentiality Order fell well within the standards announced by the Supreme Court in *Nixon.*

11. The only reason for even conducting insolvency proceedings is to assemble assets for the satisfaction of creditor claims. Creditor participation is essential.

12. We simply can discern no other rational reason why the Movants wish to have the investors identities disclosed. We also note that neither of the debtors and none of the investors or other creditors in these proceedings have objected to the protection of the identity of the investors.

## 2. The Court had Adequate Statutory Authority to Enter the Confidentiality Order.

Movants contend that, First Amendment considerations aside, the court lacked statutory authority to enter the Confidentiality Order. They urge that only section 107 (and its implementing rule, Rule 9018) permit the court to enter such orders, and none of the grounds stated in that statute (or its implementing rule) are present here. They add that the court may not use section 105 as a reservoir of authority to enter the order, because to do so would impermissibly revise or rewrite section 107. Finally, they argue that section 304 affords no basis for entering such an order.

The Movants' contentions rely on a cramped and stilted approach to statutory interpretation, aided by an talismanic reading of one sentence from the Fifth Circuit's ruling in *United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir.1986).[13] But more significantly, their argument presumes that the Confidentiality Order functions to shield matters contained in the court's files from the inquisitive eyes of the press. As we have earlier pointed out, that is not what the Order does at all. As a result of the Movants' misunderstanding of the operation of the Confidentiality Order, most of what they have to say about statutory authority misses the mark entirely.

We first of all easily dispose of the argument of which Movants are most proud. The Movants argue that the court cannot rely on section 105 as authority for issuing its Confidentiality Order because a court is not permitted to use that section to ignore or rewrite the express language of section 107 of the Bankruptcy Code. Gleefully noting that none of the conditions specified in either that section of the Code or its implementing rule apply to the facts of this case, the Movants then triumphantly announce that the court lacks the statutory basis to even enter such an order. What Movants overlook is that section 107 is not even implicated here.

Section 107 states in subsection (a) that a paper *filed* in a case is a public record, open to examination by any entity. The Confidentiality Order entered in this case does not contravene this statement of congressional policy because it does not, by its terms, apply to any paper filed in these cases. Subsection (b) of section 107 then permits the court to protect an entity with respect to trade secrets, confidential research or commercial information, or to protect a person with respect to scandalous or defamatory material contained in any paper filed in the case. 11 U.S.C. § 107(b). Subsection (b) affords the court a statutory exception to the policy set forth in (a). *See* 11 U.S.C. § 107(a) ("Except as provided in subsection (b) ..."); *see also* 1 Norton Bankr.Law & Prac. 2nd, § 15:2 (West Group 1997) ("Code § 107(b) provides some protective measures limiting the general rule permitting public access to papers"). When a court alters the requirements for what information needs to be furnished in a proof of claim, or what information needs to be furnished by an attorney or other representative of a party in interest in the bankruptcy case, it is not acting pursuant to section 107(b) because it is not purporting to alter the public's access to papers *filed* in the case. The public is entitled to see what is filed. It is not entitled to demand what must be filed. The latter falls squarely within the province of the court, in its discharge of its obligation to administer bankruptcy cases in a just, fair and efficient fashion. That duty runs not to the public, but to the participants in the bankruptcy case.[14]

13. The Fifth Circuit, in that off-quoted case (at least in bankruptcy circles), said that section 105 "does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity." *Id.*

14. Even if section 107 were applicable, Movants' cramped interpretation of its scope fails

■ The court clearly does have ample authority to enter orders under section 105 that are "necessary or appropriate to carry out the provisions of this title." [15] In this case, parties in interest requested the court enter orders modifying (a) the requirement in Rule 2019 that an entity representing more than one creditor or equity security holder disclose the name and address of the equity security holder or creditor and (b) the proviso in the Official Form for Proofs of Claim that calls for the identity and address of the claimant to be disclosed. As we have already noted, the beneficiaries of Rule 2019 are the very "represented parties" who here expressly request the waiver of this unwanted protection. They are willing to risk whatever dangers might be posed to their interests by the possibility of "improper participation," because it is more important to them that their identities not be disclosed. The only interest the court might have in enforcing the letter of Rule 2019 is to protect these very investors. These investors have waived that protection so that they can safely participate in the bankruptcy case. Thus, the only party with standing to contest a revision or modification of the rule is the party seeking its revision. Relaxing the application of protections to parties who have waived those

protections, all in the interest of maximizing effective creditor participation in the cases helps to effectuate the purposes of the Bankruptcy Code. No substantive rights are thereby created, nor are any substantive prohibitions ignored.

■ Perhaps even more importantly, Movants lack standing to contest the court's entry of orders relaxing the protections of Rule 2019. Movants are strangers to this bankruptcy case, and the Rule creates no affirmative entitlements for the benefit of the public or the press. As already noted, the Rule was promulgated for the protection of represented entities, ". . . to protect the beneficiaries from unfair practices and the like." Advisory Committee Note (1983) to Rule 2019, Federal Rules of Bankruptcy Procedure. The fact that the press may like to see this information when it is filed does not mean that the press or the public have a First Amendment right to insist that it *be* filed.

■ The investors also requested to be excused from following the precise format of the Official Form Proof of Claim. As has already been noted, the Fourth Circuit has held that the court has the authority to issue orders modifying the format for proofs of claim in exceptional circum-

to take into account cases that have construed the bankruptcy court's power to control dissemination of information more broadly. Judge Steven Gerling, for example, observed in *In re Bennett*, that

> If the information [sought to be protected] does not represent trade secrets or confidential research, development or commercial information, then whether to permit access to the information is a matter left to the Court's discretion. It requires the Court to examine the relevant facts and circumstances and then to balance the interests of the party opposing disclosure with that of the public.

*In re Bennett*, 226 B.R. 331, 336 (Bankr. N.D.N.Y.1998); *see also In re Orion Pictures*, 21 F.3d 24, 27 (2nd Cir.1994) (discussing § 107 and use of records for improper purpose); *In re Robert Landau Associates*, 50 B.R. 670, 675–76 (Bankr.S.D.N.Y.1985) (holding the court has the inherent authority to enter an order of confidentiality); *but see In re Phar–Mor*, 191 B.R. 675, 679 (Bankr.

N.D.Ohio 1995) (public disclosure of documents should be decided under § 107).

**15.** 11 U.S.C. § 105(a). In *United States v. Energy Resources Co.*, 495 U.S. 545, 110 S.Ct. 2139, 109 L.Ed.2d 580 (1990), the United States Supreme Court ratified the "traditional understanding" that bankruptcy courts are courts of equity, which have "broad authority to modify creditor-debtor relationships." *Id.* at 549. Bankruptcy courts must exercise their equitable power in a manner consistent with the Bankruptcy Code, and they may not use equity to *contradict* statutory or common law in order to reach what the court thinks is a fairer or better result. *See In re Oxford Management, Inc.*, 4 F.3d 1329, 1333–34 (5th Cir.1993) (power exercised under Section 105(a) must be "exercised in a manner that is consistent with the Bankruptcy Code"); *United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir.1986).

stances. *In re A.H. Robins Co., Inc.*, 862 F.2d 1092 (4th Cir.1988). Moreover, Rule 3001(a), by stating that proofs of claim are to conform "substantially" to the Official Form, anticipates that courts may, on a case by case basis, alter the format for proofs of claim when the facts of a case so require. The practical impediment to active creditor participation posed by the violent atmosphere in Mexico more than justifies a relaxation of compliance with the letter of the official form.[16]

Once again, Movants lack standing to contest this administrative decision. The principle party affected by this ruling is the foreign representative in each of these cases, and that party has not only not objected but has, to the contrary, expressed his support on the record in these proceedings. The press, once again, may well find proofs of claim to be a wealth of information, a source for news, but that usefulness does not convert to a First Amendment right to insist on use of the Official Form. Rule 3001 was not promulgated in order to assure that the public would know who filed claims in a given bankruptcy case. The rule was promulgated as a device to achieve creditor participation in a given bankruptcy case. Adjustments to that rule (certainly adjustments designed to maximize the goal of active creditor participation) are a matter of court and estate administration. The public and the press, as observers of the process, are free to agree or disagree with how the case is administered. They do not have a constitutional right to interfere with that administration, because the case is not administered for the benefit of the press—it is administered for the benefit of the creditors.[17]

■ These particular cases afford even broader authority to the court to afford the sort of protections contained in the Confidentiality Order, even if such authority were otherwise lacking in the usual bankruptcy case. That is because the Confidentiality Order was entered in no small part to permit investors to freely and actively participate (through counsel) in the *ancillary proceedings* that were initiated in this court by the foreign representatives of IWG and I.G. Services, who are serving in as liquidators in the United Kingdom and the Cayman Islands. In those proceedings, initiated pursuant to section 304 of the Bankruptcy Code, the court is permitted to *inter alia* "order other appropriate relief." 11 U.S.C. § 304(b)(3). That innocuous statement in fact affords bankruptcy courts broad discretion to fashion such orders as may be necessary to aid the foreign representative, "guided by what will best assure an economical and expeditious administration of [the] estate." 11 U.S.C. § 304(c). One guiding principle specified in the statute is the "just treatment of all holders of claims against or interests in such estate." 11 U.S.C. § 304(c)(1). The Confidentiality Order qualifies as an order granting "other appropriate relief," to wit, eliminating a substantial impediment to active creditor participation, thus advancing the salutary end of just treatment of investor claims in the foreign proceedings.[18]

**16.** Official forms do not have the force of law. *Simmons v. Ford Motor Credit Co. (In re Simmons)*, 237 B.R. 672, 674 (Bankr.N.D.Ill. 1999).

**17.** The press is like the audience at a professional basketball game. They have the right to see the game—even to yell their satisfaction or dissatisfaction. They do *not* have the right coach the team (much as they might want to). They do not have the right to tell the referees how to call the game (though they may express their disapproval of the way they call the game). They *certainly* do not have the right to dictate what the rules of the game are to be (much as they might like to).

**18.** No better demonstration of the success (and importance) of the Confidentiality Order can be found than the Protocol negotiated among interested parties, including attorneys representing a majority of investor claims, an agreement designed to resolve potential conflicts, eliminate wasteful jurisdictional battles among courts in three different countries, maximize efficient creditor participation, and minimize administrative expenses. This court, aware of the positive benefits of such

The Fifth Circuit has recently held that a bankruptcy court's authority to enter orders specific to the exigencies of a foreign proceeding may be substantially greater than they might otherwise be in a voluntary case initiated under the Bankruptcy Code. *In re Schimmelpenninck,* 183 F.3d 347, 361 (5th Cir.1999); *see Victrix Steamship Co. v. Salen Dry Cargo A.B.,* 825 F.2d 709, 713–714 (2nd Cir.1987). Said the Fifth Circuit,

> Subsection (b) [of § 304] is intended to arm the courts with maximum flexibility in light of principles of international comity and respect for laws of foreign nations. One court has referred to section 304's grant of judicial authority as tantamount to the power to mold relief "in near blank check fashion."

*In re Schimmelpenninck,* 183 F.3d, at 361 (quoting *In re Culmer,* 25 B.R. 621, 624 (Bankr.S.D.N.Y.1982)). While the court went on to caution that injunctive relief (in that case) could be entered only if consistent with the standards set out in section 304(c), nothing in the court's ruling diminished the force of its interpretation of section 304(b). The Confidentiality Order entered in this case is entirely consistent with section 304(c), and section 304(b) conferred ample statutory authority on the court to issue that order.[19]

For all of the foregoing reasons, the court concludes that the court had adequate authority to issue its Confidentiality Order, that it had adequate grounds for entering the Confidentiality Order, and that the entry of the Order does not impermissibly violate the First Amendment rights of the Movants.

### B. Motion for Reconsideration of the Court's Order Sealing a Portion of the Record

At the November 17 hearing on the Movants' Motion to Vacate the Court's Confidentiality Order, the parties seeking to prove that the Confidentiality Order was rightfully entered called a witness to testify to the nexus between a general climate of violence in Mexico (especially Mexico City), and the specific concerns of investors that their identities not be revealed lest they become targets of such violence. Prior to hearing the testimony of the witness,[20] the court closed the courtroom to everyone except the parties, the attorneys, and the witness.[21] The court then heard testimony from the witness regarding his personal knowledge of the dangerous and unsafe environment prevalent in Mexico as well as the fears and concerns of the investors. He specifically adverted to the experiences of one investor who, shortly after his identity became public through newspaper accounts in Mexico, was accosted by 12 gunmen, and who escaped kidnapping and injury only because his vehicle was bulletproof.

At the conclusion of the testimony from the witness, the court orally announced

protocols in other cross-border insolvency proceedings, strongly encouraged the parties to negotiate such a protocol. Had the investors' participation in these proceedings been chilled by their fear of personal injury, they would no doubt have opted for self-help remedies instead, thus undermining the foreign representatives' efforts to gain control over estate assets and to assure equitable distribution of assets to all creditor groups.

19. Once again, one must question the standing of the Movants to challenge the statutory basis for the entry of the Confidentiality Order, given that the order's function (and impact) was to mold the terms of active creditor participation in the ancillary proceedings. To return again to our basketball analogy, Movants do not have the right to insist the referee call the game their way.

20. It was important to have the witness testify, in order to properly rule on the Motion to Vacate the Confidentiality order. Of course, it was equally important that, by testifying, the witness (and family) not be placed in danger.

21. We note that Counsel for the Movants objected to the closure of the courtroom on behalf of the Movants and on behalf of Ms. Bonnie Pfister, a reporter for the San Antonio *Express–News* who was present in the courtroom.

that the record of the testimony of the witness would be sealed, and that those persons present would be prohibited from disclosing (1) the identity of the witness as well as any information that might identify the witness, and (2) the identity of the witness's family members, who are investors in one or more of the Inverworld cases. The court also orally announced that the San Antonio *Express–News* in particular would be prohibited from disseminating by way of publication any such identifying information.[22] On November 22, 1999, the court entered its written Order (the "Sealing Order") formalizing the sealing of the portion of the record pertaining to the witness testimony. The written Sealing Order modified the oral ruling announced in open court.[23]

In their Motion for Reconsideration, the Movants assert that the written Sealing Order should be set aside because (1) no good cause has been shown to deny access to the portion of the proceedings which has been sealed,[24] (2) no good cause has been

22. Counsel for the Movants objected to the court's enjoining them from disclosing to the public in general, and the press in particular, these matters, on First Amendment grounds. Counsel contended that an injunction against his disclosing to his client these matters would also prevent him from adequately representing his clients. Based on that concern, the court on the record indicated its intention to simply enjoin the newspaper from then disclosing the information it would otherwise receive, believing counsel's contention that Darrin Schlegel was a reporter for the paper as well as the corporate representative of the newspaper.

23. The written Order of the court changed the announcement made on the record in open court. After the court made the oral announcement from the bench, Testimony from Darrin Schlegel indicated that, in fact, Mr. Schlegel was *not a reporter* for the newspaper. Rather, he was a business editor, whose duties were, by his own description, limited to administration and editing. Contrary to counsel's representation that he writes under a by-line, Mr. Schlegel said he does not write, he edits. The distinction between Mr. Schlegel acting as an editor or reporter is important because it shaped the injunction in the written Sealing Order. Because Mr. Schlegel said he was an editor and not a reporter, rather than enjoining the newspaper from publishing (as was announced in open court), the court deemed it more appropriate that it return to its original intent and enjoin counsel from disclosing, with some minor modifications, because there was no longer any real danger in counsel being prevented from conferring with his client representative (identified as Mr. Schlegel), because his client is not a reporter. Specifically, the written Order provides in pertinent part:

Accordingly, the court seals the testimony of the witness (and the identity of that witness) as reflected on Tape 3 and its accompanying log notes. The tape may only be transcribed if requested by a party to this action, and the seal applies to the transcriber and to the resulting transcription. The transcript may of course be revealed to any appellate court and staff, with the understanding that those courts will determine the scope of seal that ought to apply once the matter is entrusted to those courts.

Mark Cannan and James Hoffman, co-counsel for the San Antonio Express–News and Darrin Schlegel, are enjoined from disclosing to anyone other than their client representative, Darrin Schlegel, the aforementioned matters with regards to the contents of Tape 3. Darrin Schlegel is enjoined from publishing to any reporter the matters disclosed to him in the course of his counsel's representation with regard to this matter. As he has been proffered as the client representative on this matter, he is presumed to be the decision maker as well, and so is prohibited from making disclosures to anyone else, including other management personnel of the San Antonio Express–News. This injunction will dissolve upon application to this court and a showing that the events that have compelled the entry of this injunction are no longer present.

The bench ruling enjoining the San Antonio Express-news from publishing the aforementioned information has become moot, because now counsel will be able to confer with their client, yet still be barred from making disclosures. Further, Darrin Schlegel will be able to make decisions on behalf of San Antonio Express–News and still be barred from making disclosures without impinging on his rights as a reporter, because the evidence shows that he is not, after all, a reporter. This order thus supplants the oral announcements made on the record. It is effective *nunc pro tunc*.

24. The court has good cause to enter the Sealing Order for the same reason it has good

shown for the court to issue a prior restraint upon the dissemination of information disclosed in the sealed portion of the record; and (3) the Order sealing the record is an impermissible restraint upon attorney-client communications.

### 1. The Sealing Order is not a Prior Restraint on the Dissemination of Information

The doctrine of prior restraint has its genesis in *Patterson v. Colorado,* 205 U.S. 454, 27 S.Ct. 556, 51 L.Ed. 879 (1907). In *Patterson,* the Supreme Court held that the main purpose of the First Amendment was to prevent prior restraints upon publications as had been practiced by governments of other countries. A prior restraint has traditionally been defined as a "predetermined judicial prohibition restraining specified expression...." *Chicago Council of Lawyers v. Bauer,* 522 F.2d 242, 248 (7th Cir.1975), *cert. denied,* 427 U.S. 912, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976); *see also Nebraska Press Association v. Stuart,* 427 U.S. 539, 559, 96 S.Ct. 2791, 2802, 49 L.Ed.2d 683, 697–98 (1976).

The parameters of the doctrine of prior restraint have been defined in cases in which *the press* has been enjoined from *publishing* information. *See New York Times Co. v. U.S.,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); *Nebraska Press Association v. Stuart,* 427 U.S. 539, 559, 96 S.Ct. 2791, 2802, 49 L.Ed.2d 683, 697–98 (1976). The case before this court is distinguishable from these cases because the information protected from disclosure by the Sealing Order is not in the possession of a reporter or the press *per se,* but rather in the hands of the *parties* to this action. The distinction is a fine one—but

it is also critically important. The issue of restraints on *parties* to an action (as opposed to restraints on the press) was squarely addressed by the Second Circuit in *In re Dow Jones & Co.,* 842 F.2d 603, 608 (2nd Cir.1988). There, a trial court issued a so-called "gag order," applicable to the parties and their counsel, restraining extrajudicial speech by all trial participants. The news agency challenged the order as a prior restraint, a position rejected by the appellate court:

> ... [T]here is a substantial difference between a restraining order directed against the press—a form of censorship which the First Amendment sought to abolish from these shores—and the order here directed solely against trial participants and challenged only by the press. The distinction is critical.... Although the restraining order in this case limits the flow of information readily available to the news agencies—and for that reason might have an effect similar to that of a prior restraint—the fact that the order is not directed at the news agencies and that they therefore cannot be haled into court for violating its terms deflates what would otherwise be a serious concern regarding judicial censorship of the press. For this reason the order is considerably less intrusive of First Amendment rights than one directly aimed at the press.... [W]e conclude that there is a fundamental difference between a gag order challenged by the individual gagged and one challenged by a third party; an order objected to by the former is properly characterized as a prior restraint, one opposed solely by the latter is not.

*Dow Jones,* 842 F.2d, at 608–09; *see also The News–Journal Corp. v. Foxman,* 939

cause to enter the Confidentiality Order. The evidence establishing good cause for issuing both the Confidentiality Order and the Sealing Order consists of: the testimony of the undisclosed witness, newspapers articles describing the severity of crime and kidnapping in Mexico, newspaper articles discussing the dangers associated with open appearances of

wealth, and affidavits of investors stating they would decline to participate in these proceedings if their identities were disclosed because of fear for the personal safety of themselves and their families. Accordingly, the good cause reasons previously discussed are incorporated here.

F.2d 1499, 1512 (11th Cir.1991); *Radio & Television News Ass'n v. United States District Court for the Central District of California*, 781 F.2d 1443, 1446 (9th Cir. 1986) (restraining order not directed at the press does not restrain press' First Amendment rights). The Eleventh Circuit followed the Second Circuit in *News–Journal*, citing as further support the Supreme Court's observation in *Gentile v. State Bar* that the speech of lawyers representing clients in pending cases may be regulated under less demanding standards than that established for the press. *News–Journal, supra,* citing *Gentile v. State Bar*, 501 U.S. 1030, 111 S.Ct. 2720, 2744, 115 L.Ed.2d 888 (1991). Added the Eleventh Circuit:

> Significantly, the Supreme Court has suggested a restrictive order limiting extrajudicial commentary of trial participants as an alternative to a prior restraint on the media. *Sheppard v. Maxwell*, 384 U.S. 333, 361, 86 S.Ct. 1507, 1521, 16 L.Ed.2d 600 (1966).

*Id.*, at 1512–1513.

■ What makes applying *Dow Jones* to our facts especially difficult is that one of the parties to this particular hearing was the press—the *Express–News*. Usually, of course, the press is covering a given trial, but it is not also a party. To borrow from our basketball game analogy, the press is normally like the audience, while the parties are the players. In the peculiar circumstances of our case, the press seems to be *both* the audience *and* one of the players! How did this come about?

The *Express–News*, in challenging the Confidentiality Order, insisted that positive evidence of an actual threat to in-vestors was required to justify the Order. The witness called to provide such evidence of necessity had to disclose identity. The witness also testified that a relative is an investor. Finally, the witness testified to the actual experiences of another investor who was attacked by gunmen not long after his identity as an investor was disclosed. The court understandably was favorably inclined to a request that this witness' identity (and the identity of the relative) not be disclosed—for to do so would subject the witness and the witness' family to the very danger to which the witness had just testified. The *Express–News* promptly insisted that this witness's identity should *not* be concealed, notwithstanding the danger. Evidently, the *Express–News* believed that this person's identity was newsworthy and should be published, even after hearing that to do so might put an innocent person's life in danger. The obvious basis for the newspaper's legal position was that, because it is "the press," and because it had just "heard" this information in open court, any court order barring the paper from publishing this information would constitute an impermissible "prior restraint."

The obvious unfairness (to say nothing of the extraordinary callousness)[25] of the newspaper's position suggests that the *Express–News'* interpretation of the First Amendment's protections is flawed, at least under the unique circumstances of this case. The court in fact cleared the courtroom of members of the public (including a reporter from the *Express–News*) before taking the testimony of this witness.[26] The only reason that Darrin

---

**25.** The newspaper might well chafe at this characterization of their legal position, arguing that they in fact had no intention of actually placing anyone in danger, and they are merely being vigilant in protecting their First Amendment rights. Such protestations would ring hollow, however, as the newspaper could easily enough have simply announced on the record their intention not to publish the story *voluntarily*. The press can certainly choose to waive its right to publish information without in the process waiving its first amendment rights. This they chose not to do, leaving this court to conclude that the newspaper in fact has every intention of endangering the lives of innocent people in the pursuit of sensationalist tidbit.

**26.** There is ample authority that courts have the right to close the courtroom under circumstances such as those present here. The standard for closing a court room is much

Schlegel remained in the courtroom was that he had been identified by counsel as the corporate representative of a *party* to the proceedings, namely the *Express–News*. In other words, the entity that remained in the courtroom was not the press *per se* (they had already been sent outside)—it was a party to the proceedings. Returning to our basketball analogy, the *Express–News* could be a member of the audience, or it could be a player on the floor. It could not be both.[27] In other words, the *Express–News* cannot evade the rules that apply to parties in a case simply because it happens to be a news organization. As a party, it must comply with the rules and directives that apply to any other party in a court proceeding.[28] The *Dow Jones* analysis thus applies here to the *Express–News* in its capacity as a party to the proceedings.

Because the movants were in the court room only as parties to the action, the court's order is not a restraint on the newspaper's publishing information already in its possession, but instead is a restraint on the newspaper's potential *sources* from talking to the newspaper about what they saw or heard. Consistent with *Dow Jones*, the court's Sealing Order functions as a restrictive order limiting the commentary of trial participants (one of

which happens to have been the *Express–News*), and is expressly *not* a restraint on the newspaper *qua* newspaper. Because of the uniqueness of this case, of necessity, the party restrained *is* the newspaper, but in its corporate capacity as a party challenging the order and not as a reporter of the news (i.e. member of the audience). The restraint placed on Darrin Schlegel, as trial participant (as both an individual and as corporate representative for the news organization), falls squarely within the important distinction outlined by the Second and Eleventh Circuits. *Dow Jones, supra; News–Journal, supra.* True enough, the newspaper is restrained from *gathering* information from Mr. Schlegel for later publication, but, as the Supreme Court has pithily observed, "the right to speak and publish does not carry with it the unrestrained right to gather information." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976).

Of course, even gag orders must withstand scrutiny, though a lesser scrutiny than that imposed on prior restraints aimed directly at the press. The Supreme Court has held that a defendant's Sixth Amendment right to counsel, and a person's Fifth Amendment right to due process of law will trump the press' asserted First Amendment right to gather informa-

---

lower than the standard than that is imposed upon prior restraints. Under *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), "the party seeking to close the hearing must advance an over-riding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding and it must make findings adequate to support the closure." The threat of physical danger and/or death to the witness, the fact that the courtroom was only closed for the duration of the witness's testimony and because no less intrusive measures were available, the closing of the courtroom withstands any challenge by the *Express–News.*

**27.** Sean Elliott, a forward for the San Antonio Spurs professional basketball organization, is currently injured and cannot play. Everyone in San Antonio knows that he is a player—but

when he sits in the stands these days, watching the game, he is a fan, not a player. He can't dunk, block, guard, take three-pointers, commit fouls, take foul shots, or foul out from his seat in the stands. Meanwhile, Terry Porter wears a uniform, does all those things, and must do what the referee tells him to do for so long as he is on the floor playing.

**28.** The distinction is especially easy to appreciate in this case because Darrin Schlegel testified that he was *not* a reporter. The *Express–News* reporter, Ms. Bonnie Pfister, left the courtroom along with other members of the public, when the courtroom was closed to take the witness' testimony. The person who stayed in the courtroom did so in the capacity of a corporate representative and a party. He did not stay in any reportial capacity, in no small part because he is not a reporter in the first place—he is an editor (part of management).

tion. *Gentile, supra; Sheppard, supra.* We believe that, if these constitutional protections weigh heavier in the balance than the press' First Amendment concerns in the "gag order" context, then certainly a court's legitimate concern for the physical safety of a witness and that witness's relatives should weigh more heavily as well.

## 2. Any Prior Restraint Present is Justified in This Case

 Even assuming the Sealing Order does constitute a prior restraint, it is certainly valid on the facts of this case. We acknowledge that prior restraints on freedom of speech have long been disfavored in American law. *Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).[29] A prior restraint is not unconstitutional *per se,* though there is a heavy presumption against its constitutionality. *See Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 558–59, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448, 459 (1975); *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1, 5 (1971). Because of the presumption against constitutionality, the party seeking to justify a prior restraint on speech carries a heavy burden of justifying such restraint. *Id.* at 419.

Although a prior restraint comes with a heavy presumption against constitutional validity "the protection even as to previous restraint is not absolutely unlimited." *Near v. Minnesota,* 283 U.S. 697, 716, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). Although the protection against a prior restraint is not unlimited, the Supreme Court has said that "[a] person may not be prevented from speaking unless what he or she will say or the time, place, and manner in which he or she will say it will 'surely result in direct, immediate, and irreparable damage.'" *New York Times Co. v. United States,* 403 U.S. 713, 730, 91 S.Ct. 2140, 2149, 29 L.Ed.2d 822 (1971) (Stewart, J., joined by White, J., concurring); *see also Nebraska Press Association v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971).

Using this language as their basis, the movants argue that a prior restraint is not proper in this case until the investors show that disclosure of their names and addresses will result in direct, immediate, and irreparable damage. Movants' reading of the prior restraint rule converts it into a *per se* rule, one which never requires an examination of competing factors. Under our set of facts, what amount of evidence is necessary to validate the prior restraint in this case? A kidnapping? A rape? A murder? Must the court wait to issue a restraint until after the egregious harm actually occurs?[30] We think not. Although the standards for imposing a prior restraint are quite high, they are not so high that they can never be achieved under any set of facts. Under the movants standard a showing by the protected parties of a high probability and likelihood of harm would never be enough to justify a prior restraint.

 We find the movants argument for application of such a high standard to be an incorrect application of the law. Instead, we follow the abundance of cases which test the validity of a prior restraint based on a *balancing* of the First Amendment rights of the public and press against the rights of the parties protected by the prior restraint.[31] The Supreme Court has said that "The phrase 'prior restraint' is

---

29. As one commentator has eloquently observed: "Prior restraints fall on speech with a brutality and a finality all their own. Even if they are ultimately lifted they cause irremediable loss a loss in the immediacy, the impact, of speech." A. Bickel, The Morality of Consent 61 (1975), quoted in *Nebraska Press Association v. Stuart,* 427 U.S. 539, 609, 96 S.Ct.

2791, 2826, 49 L.Ed.2d 683, 727 (1976) (Brennan, J., concurring).

30. We only speculate as to what direct, immediate, and irreparable evidence the movants would require the investors to provide.

31. This standards applies to both the prior restraint concerning the dissemination of in-

not a self-wielding sword. Nor can it serve as a talismanic test." *Kingsley Books, Inc. v. Brown*, 354 U.S. 436, 441, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957). Discussing the validity of a judge's order in a prior restraint case the Supreme Court of the United States said "the gravity of the 'evil,' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger." *See Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 562, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976).[32] We are convinced that the gravity of the evil in this case (high probability of injury or death to the witness and the witness's family) justifies the invasion of free speech (the Sealing Order) as is necessary to avoid the danger (injury or death to the investors).

To prove the gravity of the evil in this case, the investors introduced a witness who testified that he and his family were personally aware of another investor who had openly bragged of his investments in Inverworld, only to be accosted by 12 armed gunmen. This testimony alone establishes sufficient evidence of a nexus to

at least warrant protection of the identity of the witness and the witness's family from a similar danger found to be real. The testimony also established that San Antonio *Express–News* stories on this topic are routinely reprinted in a Spanish language paper with fairly wide circulation in Mexico, confirming that the story, if printed, would in all likelihood be reproduced in a forum (and language) easily perused by the sorts of persons likely to want to attack persons perceived to "have money" in Mexico. Finally, the overall climate of violence against wealthy persons in Mexico, likely to include Inverworld investors, is compelling. Taken together, these facts certainly warrant a prior restraint and the sealing of the record with regard to the testimony of this witness. Simply put, this court is not going to trifle with other people's lives over an academic dispute about the a point of law—even if it is a point of Constitutional law.[33]

## III. CONCLUSION

This case turns ultimately on the sound discretion of the bankruptcy court to enter

formation and the alleged prior restraint on attorney-client communications, though in this case, the order entered by the court does not restrain attorney-client communications. As we have already discussed the Sealing Order is merely a "gag order" with regards to the attorneys and parties.

**32.** In *Stuart*, a Nebraska state trial judge, in anticipation of a trial for a multiple murder which had attracted widespread news coverage, entered an order which, as modified by the Nebraska Supreme Court, restrained the news media from publishing or broadcasting accounts of confessions or admissions made by defendant to law enforcement officers or third parties, except members of the press, and other facts "strongly implicative" of the defendant. The Court held that the barriers to prior restraint remain high and the presumption against its use continues intact; and that the heavy burden imposed as a condition to securing a prior restraint was not met in this case.

**33.** The court notes that it did not locate a case affirming the validity of a prior restraint in facts even remotely close to those present here. However, all of the prior restraint

cases state that a prior restraint can be issued in certain circumstances. Perhaps there is no case law supporting a prior restraint because the facts were not as clear as they are here. Perhaps it was because the consequences did not involve the likelihood of injury or death to a human being. Maybe it was because those courts which have issued or upheld valid prior restraints did not feel compelled to write and publish an opinion on the matter. Whatever the reason, it does not matter. This court does not need pages and pages of legal doctrine to make a decision based on old-fashioned common sense. The balancing of the interests in this case weigh heavily in favor of the investors. Indeed, while First Amendment rights are very important in our society, they are not so important that this court must sacrifice the lives of innocent people. This court is not willing to drown its hands in the blood of innocent people in defense of the press' asserted First Amendment right to publish a story. The decision to sacrifice innocent people's lives in the name of a story will have to be made by another court. This court strongly doubts that the Movants will find any court willing to read the Constitution with the same sort of zealotry urged by the Movants.

398

appropriate orders regarding what information needs to be furnished to the court as a prerequisite to participation in the case. In a very real sense, the issue of access to judicial records, present in *Nixon v. Warner Communications,* is absent here. There are no "judicial records" access to which is being denied. Movants complain that the court should not have excused these investors from furnishing their identity to the court. They fail to explain how Movants have a right to insist on the court's compelling the *filing* of this information. The court could as well be criticized for not requiring all debtors to furnish a photograph with their bankruptcy petition (so that the newspaper could then publish the picture in a news story about people who have filed bankruptcy on a given day).[34] It is for the court, in its administration of justice, and not the media, to determine what information in fact needs to be elicited from creditors in a case in order to successfully administer a given case. Once that information becomes part of the public record, access to that information will be governed by the principles announced in *Nixon. See Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978); *In re Express–News Corp.,* 695 F.2d 807, 810 (5th Cir.1982); *Belo Broadcasting Corp. v. Clark,* 654 F.2d 423 (5th Cir.1981); *In re Bennett Funding Group, Inc.,* 226 B.R. 331 (Bankr.N.D.N.Y.1998). The investors have provided a good cause basis in this case for the entry of both the Confidentiality Order and the Sealing Order, assuming *Nixon* applies. But *Nixon* does not impose a duty on courts to *extract* information from case participants *for the benefit* of the press. That, in a nutshell, is what Movants really seek. The argument is, of course, specious. *Elrod v. Burns,* 427 U.S., at 373, 96 S.Ct., at 2689 (the right to speak and publish does not carry with it the unrestrained right to gather information).

Based on the foregoing, the Court concludes that Movants (1) Motion to Vacate the Court's Order Granting Motion to protect Confidentiality of the Identities of Investors; and (2) Motion for Reconsideration of the Court's Order Sealing a Portion of the Record are without merit. Accordingly, they are **Denied.**

So ORDERED.

---

34. A newspaper in El Paso in fact publishes a daily report of persons who have filed bankruptcy in that city.